**Dean HALES et al., Appellees,**

v.

**GREEN COLONIAL, INC., a corporation, et al., Appellants,**

v.

**Harold MUNROE, Third Party Appellee.**

**Nos. 73-1122, 73-1136 and 73-1139.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 16, 1973.

Decided Jan. 17, 1974.

Rehearing and Rehearing En Banc Denied Feb. 6, 1974.

**1016**

James Borthwick, Kansas City, Mo., for Iowa Plumbers.

Thomas A. Sweeney, Kansas City, Mo., for Munroe.

Michael E. Waldeck, Kansas City, Mo., for appellee.

Before LAY and BRIGHT, Circuit Judges, and G. THOMAS EISELE, District Judge.*

LAY, Circuit Judge.

This is an appeal from money damages awarded for the destruction of a building and its contents by a fire allegedly caused by a defective heater. The trial court submitted the cause to the jury on the theory of strict liability under Missouri law. The jury awarded plaintiffs $102,594.00. The trial court overruled defendants' motion for a judgment notwithstanding the verdict and their alternate motion for a new trial. We affirm.

Plaintiffs, Dean Hales, Bernadine Hales and James Mogg, were the owners and operators of a Ben Franklin Store in Hamilton, Missouri. In June of 1970, they moved the location of their store to a remodeled building. To determine the heating needs of their new store they contacted Harold Munroe, a licensed plumber and heating installer, who along with a representative of Green Colonial, Inc., an Iowa supplier of heating equipment, visited the premises. Munroe determined that both a 300,000 BTU heating unit and a 150,000 BTU heating unit were necessary to sufficiently heat the store. Munroe ordered from Green Colonial two Peerless brand heaters, specifying that they burn LP gas (propane) since Hamilton had no natural gas supply. Green Colonial in turn placed the order for the two Peerless heaters with Iowa Plumbing Supply, Inc., a distributor in Des Moines, Iowa (IPS). Dover Corporation was the manufacturer of Peerless heater units.

Dan Hale, St. Joseph, Mo., for Dover.

Joseph K. Houts, St. Joseph, Mo., for Green.

* G. THOMAS EISELE, United States District Judge for the Eastern District of Arkansas, sitting by designation.

IPS furnished to Green Colonial one 150,000 BTU propane heater and one 300,000 BTU natural gas unit with a conversion kit so that it could be used with propane gas. Green Colonial sent these units on to Munroe. Both of the heaters were installed by Munroe and connected to a propane gas tank by the Solar Gas Company of Hamilton. In October of 1970 Munroe converted the 300,000 BTU natural gas heater by using a conversion kit sent to him from Dover.[1] The conversion kit is manufactured by a different company but Dover supplies them to be used for converting their natural gas heaters. In making the conversion Munroe reduced all the orifices, reduced the elbow pipe and substituted an LP gas valve for the one used for natural gas. He likewise changed the blue tag which was on the natural gas heater to a red tag which designated a propane heater. The red tag along with the orifices, valve and elbow pipe constituted the packaged conversion kit sent by Dover to Munroe. Dover did not send any instructions with the kit. Munroe testified he had made conversions before and was familiar with the procedure. The heaters were operated for approximately a week at which time they were inspected by Munroe. He found the flame to be normal.

In early November the plaintiffs began noticing strange popping and exploding noises coming from the 300,000 BTU heater. On December 10, the gas company representative came and adjusted the gas pressure to 11 inches of water column, the specified setting required by Dover. According to Dover's experts the reading was taken erroneously and was made at the wrong place. The noises continued and on December 18, a fire caused by the larger heater ignited the combustible contents of the store and destroyed the building.

■■ Plaintiffs brought suit against Green Colonial, Dover and IPS. Dover sought indemnity against Harold Munroe, the installer. Green Colonial and IPS brought cross-claims for indemnity against Dover. The jury returned a verdict against the three defendants. Prior to the submission of the case to the jury, the trial court dismissed the claim against Munroe.[2] The court has reserved its ruling on the cross-claims by Green Colonial and IPS against Dover.

On appeal several grounds of error are raised by the defendants. We find only two issues deserve extended consideration: (1) whether the evidence was sufficient to submit the defendants' liability under the doctrine of strict liability; and (2) whether damages awarded for consequential loss are proper in Missouri under strict liability. We have reviewed the other grounds of error and find they facially lack merit and do not warrant discussion.[3]

In regard to the first issue the defendants contend that (a) there has been no showing of an unreasonably dangerous defect, (b) the product was substantially changed from the condition in which Dover originally sold it, and (c) the plaintiff was guilty of contributory fault.

## THE DEFECTIVE HEATER

Plaintiffs' evidence that the Peerless heater, as converted, was defective rests solely on the testimony of Alfred Ben-

1. Munroe explained that he had either used or misplaced the original conversion kit sent him at the time the heater was originally furnished.

2. We find no error in this. We think it clear *if* Dover is liable to plaintiffs for *furnishing a defective heater* which caused the fire it would not be legally possible for it to obtain indemnification for alleged faulty installation. Nor do we find error in the dismissal of the claim before it was submitted to the jury as the defendants assert.

3. Although the parties urge us to pass on the merits of the cross-claims "to avoid piece-meal appeals" we decline to do so. There is no judgment on the cross-claims by the district court and any ruling we could now give would be advisory. This we lack power to do.

berg, a consulting engineer and architect, registered in the State of Missouri. After examination of the Peerless unit he opined that the heater was defective for two reasons: (1) it did not have a flame tube which would ignite all the burners simultaneously, and (2) the air shutter bar was designed in such a manner as to cause delayed ignition regardless of how it was adjusted. He testified that these two defects caused the heater to backflash thereby igniting combustible goods on display in the store. Defendants attack this testimony as being speculative and without any scientific or engineering certainty. They couple this attack with the fact that their expert witnesses, also licensed engineers, suggest that the burner was operating without sufficient gas pressure and that this in reality caused the fire. They urge that the manual setting of the air adjustment bar by Mr. Munroe, the installer, along with the improper pressure set by the gas company caused a delayed ignition and the resulting fire. The defendants also offered testimony that the particular heater in question had been certified as being safe and properly designed by the American Gas Association, a trade organization for the natural gas industry.

Plaintiffs' evidence as to causation causes this court, as it did the trial court, a good deal of difficulty. Mr. Benberg's opinion that the air adjustment valve did "not provide sufficient air adjustment to be sure that you get an even distribution through the burners" is not amplified or explained. This theory was not developed in any detail during either the direct or cross examinations. As the defendants suggest Mr. Benberg's explanation is confusing to say the least.[4]

Defendants' engineer points out that LP gas requires 10% less air for combustion than natural gas. His testimony was that the adjustment of the air vent cannot in any way affect the velocity of the *gas* but simply affects the mixture of the air with the gas, thus determining whether there will be a rich or lean combustion. Plaintiffs urge on appeal that the fault with the air vent lies with the fact that the air adjustment bar is not designed to allow for individual adjustment to any one of the 18 burners. The record shows, however, that Mr. Benberg did not attribute the cause of the fire to the absence of individual adjustment. His testimony points up that the triangular flanges or fingers on the bar can be individually adjusted. Mr. Benberg's complaint is that there is not an *even distribution* throughout all the burners. Without further explanation we find Mr. Benberg's bare conclusion concerning the air bar insufficient to sustain the verdict.

However, notwithstanding this shortcoming, we find it a fair inference from his testimony that the basic heater lacked a flame tube in the back of the burners which would provide uniform ignition from the single pilot light. This is explained by Mr. Benberg as follows:

A. The effect of not having a flame tube or a carryover tube is that the flame must jump from one burner to the other, two inches, as a matter

---

4. Q. (By Mr. Waldeck) Mr. Benberg, with regard to the air shutter bar and the flanges on it, what is the effect of the flanges with regard to the venturi principle? A. By the flanges you mean these triangular fingers that stick up?
 Q. The fingers. A. It reduces the velocity of the stream and—rather it increases the velocity of the stream.
 The Court: Talking about air or gas?
 The Witness: The mixture of air and gas, because this particular—it reduces

the gas stream, or rather increases the velocity of the gas stream, and therefore
—
 Mr. Hale: Now, Your Honor, I'm confused whether he means that when you move this finger over into the stream of gas, Mr. Benberg, are you testifying that increases the velocity of the gas stream?
 The Witness: That's right.
 Q. (By Mr. Waldeck) Go ahead, Mr. Benberg. A. Therefore, you will get some air pulled in. How much I don't know.

of fact. Whereas, if they had a carry-over tube the flame would be, a perforated lighter tube, the flame continues for the entire length and they would all light up at the same time. Now, they have to jump a total of two inches. But this is—or over two inches, as a matter of fact. This is particularly undesirable when it's LP gas because of the fact that LP gas is lighter and it comes out and then it will drop down, whereas natural gas, that will come out in a cone, you'll have a much easier distribution or propagation of the flame. But you have two inches to jump here, and it just, in my opinion, can't do it, properly and safely.

Plaintiff Dean Hales' own testimony was that on one occasion shortly before the fire the unit "exploded so hard" that it "bent the metal bottom down." Plaintiffs' theory, as urged on appeal, is that the gas dropped down, collected in the botton of the unit and because of imperfect ignition, finally exploded.

 Benberg's testimony concerning the absence of the flame tube was not subjected to any cross-examination. Defendants challenge it on appeal on the basis that one of their witnesses, Robert Mackley, the chief engineer for Peerless Division of Dover, explained that the unit has a continuous series of ports, called carry over ports, on the back, which ignite simultaneously. It was conceded by the defense that there was no flame tube as such on the unit but that the continuous ports constituted its equivalent. The unit along with photographs are in the record. The exhibits demonstrate that there is not a continuous connection on the 18 burners. This evidence was before the jury. We find the exhibits when coupled with plaintiffs' explanation are sufficient to create a reasonable inference that the heating unit was defective in that delayed ignition could result by reason of the absence of a flame tube. *See* Tucker v. Central Hardware Co., 463 S.W.2d 537 (Mo.1971).[5]

## NO "SUBSTANTIAL" CHANGE

Missouri has adopted § 402A of the Restatement (Second) of Torts (1965), which permits the liability of the supplier of a chattel to be determined under the doctrine of strict liability. *See* Keener v. Dayton Electric Mfg. Co., 445 S.W.2d 362 (Mo.1969). This court has recently reviewed the Missouri cases as they relate to strict liability and defective design. *See* Hoppe v. Midwest Conveyor Co., Inc., 485 F.2d 1196 (8th Cir. 1973).

5. In Tucker v. Central Hardware Co., 463 S.W.2d 537 (Mo.1971), plaintiff's expert witness, Dr. Koopman, provided sufficient basis to submit the issue of an alleged defective cable as causing a fire. The Missouri Supreme Court observed:

In our opinion the testimony of Doctor Koopman was sufficient to permit the jury to find that the more reasonable probability was that the fire resulted from a defect in the cable for which defendant was responsible, i.e., which existed at the time of installation of the cable. Such was the burden of plaintiffs. They were not required to produce "absolutely positive" proof. "The finding, however, must be based upon probative facts, and a verdict founded on speculation and conjecture cannot stand. American Cyanamid Co. v. Fields, supra [4 Cir., 204 F.2d 151]. Probative facts may be established by cir-

cumstantial evidence, and while circumstantial evidence need not have the quality of absolute certainty, Ferrell v. Sikeston Coca-Cola Bottling Co., Mo.App., 320 S. W.2d 292, the circumstances must point to the desired conclusion with such a degree of certainty as to make that conclusion reasonable and probable and must rise above the stature of guesswork, speculation or surmise. Gray v. Williams, Mo. App., 289 S.W.2d 463. Plaintiff's evidence must be viewed in the light most favorable to him, and he is entitled to the benefit of all inferences reasonably arising from the evidence. American Cyanamid Co. v. Fields, supra." Green v. Ralston Purina Company, Mo.Sup., 376 S.W.2d 119, 123–124[1–4]. Koopman's testimony was substantial evidence justifying a submission of plaintiffs' cause.

*Id.* at 540.

In the instant case the trial court instructed the jury as follows:

First, defendants sold the Peerless heater unit manufactured for use with natural gas, and

Second, that the Peerless heater unit as manufactured by defendant Dover was defective and, therefore, dangerous when put to the use reasonably anticipated, and

Third, that the defendant Dover supplied the parts designed to convert the natural gas heater to a propane gas heater, and if you further find that when such parts were properly installed to convert the natural gas heater to a propane gas heater said heater as converted was in substantially the same condition as it would have been if originally sold by defendant Dover for use with propane gas, and

Fourth, plaintiffs used the Peerless heater unit in a manner reasonably anticipated and that as a direct result of defects in the Peerless heater unit as sold by defendants plaintiffs' building and the contents were caused to be destroyed by fire as a result of such defects, then your verdict would be for the plaintiffs and against the defendants.

Defendants challenge the third paragraph of the above instruction, asserting that since the heater was converted from one using natural gas to one using LP gas it was no longer in the same condition as it was when it left the hands of Dover. They therefore urge that the doctrine of strict liability is not applicable.

It is true that when the heater left Dover it was designed only for the use of natural gas. We assume for purposes of our discussion that the unit was properly designed for natural gas. The defendants contend that since the unit was substantially changed when converted to a propane heater the defendant manufacturer is not liable under § 402A of the Restatement. The difficulty with the defendants' argument is that the evidence shows Dover manufactured its natural gas units so they could be converted for LP gas. And in fact the particular conversion unit was sent by Dover to Munroe for this very purpose. The evidence also shows that Munroe was paid by Green Colonial for the work of converting[6] the unit to LP gas since Munroe had orginally ordered an LP gas unit but instead was supplied with a natural gas one. Furthermore the evidence establishes that although the defendants' engineers called Munroe's work "sloppy" his conversion was done only with the parts furnished him in the conversion kit. There is nothing to show that Munroe did not install the parts within normal tolerances or that the conversion itself contributed to the fire.

■■ The law recognizes that there can be strict liability of a supplier even though the product is altered or changed if it is foreseeable that the alteration would be made and the change does not unforeseeably render the product unsafe. In effect the question involved is simply whether the intervening alteration of the product was the superseding cause of the injuries. Mazzi v. Greenlee Tool Co., 320 F.2d 821 (2d Cir. 1963). Cf. Dennis v. Ford Motor Co., 471 F.2d 733 (3d Cir. 1973). As the Second Circuit recognized:

[T]he mere fact that there has been some alteration of the product does not, as a matter of law, relieve the manufacturer of liability otherwise attaching to it. . . . This, it seems, to us, must be the essence of any doctrine of "substantial alteration", and if the evidence was such that the jury could reasonably have found that the alterations in question

---

6. These facts at least as they apply to Green Colonial are analogous to the automobile dealers servicing and making mobile a new car at the request of the manufacturer. Cf.

Vandermark v. Ford Motor Co., 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168 (1964) (en banc).

were not a superseding cause of the injury, it was error to direct a verdict on that ground.

*Mazzi, supra* 320 F.2d at 826.

*See also* Sharp v. Chrysler Corp., 432 S. W.2d 131 (Tex.Civ.App.1968). Missouri has recognized that the alteration of a product does not by itself render the doctrine of strict liability inapplicable. *See* Williams v. Ford Motor Co., 411 S. W.2d 443, 450 (Mo.App.1970). Where the inadequacy of the change or alteration is the sole cause of the damage then the question is one of law for the court. Swindler v. Butler Mfg. Co., 426 S.W.2d 78 (Mo.1968). However, where the evidence is conflicting, it is generally a question for the jury to determine whether the defect is traceable to the time the product left the manufacturing company. *See* Williams v. Ford Motor Co., *supra*; Anderson v. Klix Chemical Co., 256 Or. 199, 472 P.2d 806 (1970).

## CONTRIBUTORY FAULT

■ Defendants also urge that plaintiffs were guilty of "contributory fault" since they had prior knowledge that the heater was not working properly. Under the doctrine of strict liability plaintiffs cannot be guilty of contributory fault unless they had knowledge of the specific defect and continued to use the heater knowing it to be dangerous. *See* Williams v. Ford Motor Co., 454 S.W.2d 611 (Mo.App.1970). In Morrow v. Caloric Appliance Corp., 372 S.W.2d 41 (Mo.1963) (en banc), the facts were somewhat similar. The Supreme Court of Missouri rejected an instruction charging plaintiffs with knowledge of the dangerous potentialities of a stove, even though they knew it was not functioning properly. The court said plaintiffs "should not be required to anticipate that the valve controlling the left burners was also defective." *Id.* at 57. In the present case the facts show that when the plaintiffs observed and heard the popping noises they called the gas company whose serviceman came out and regulated the pressure. Defendants assert that the gas company improperly lowered the pressure. However, defendants' experts admitted they were not aware of a pressure regulator on the back of the stove. Plaintiffs' rebuttal by the gas company serviceman was to the effect that the regulator on the back of the stove was the controlling regulator and that he had properly taken the pressure at the right place. All of these facts were for the jury. In view of the favorable verdict for the plaintiffs they are entitled to the presumption that the jury rejected the defenses of contributory fault and the improper pressure as intervening causes.

We conclude that the evidence was sufficient to sustain the verdict for the plaintiffs.

## DAMAGES

The defendants maintain that under the doctrine of strict liability damages for destruction of property and consequential losses are not recoverable in Missouri. The assertion is that the Missouri cases dealing with strict liability have involved only physical harm. This overlooks Morrow v. Caloric Appliance Corp., 372 S.W.2d 41 (Mo.1963) (en banc), as well as the subsequent adoption by the Missouri Supreme Court of Restatement (Second) of Torts § 402A (1965), which extends the doctrine of strict liability to property damage as well as physical harm.

■ Defendants contend that consequential damages such as loss of profits, the cost of repairs and the expense of cleaning up after the fire are not recoverable under strict liability. We deem the cost of repairs and clean-up as an integral part of the direct property damage incurred. We are, however, somewhat troubled by the $8,000.00 awarded for loss of profits. This is an indirect economic loss and thus must be classified as consequential damages. The argument is made that strict liability is akin to an action for implied warranty and that consequential damages

are not actionable under that theory in Missouri.[7] *See* Smith v. Ford Motor Co., 327 S.W.2d 535 (Mo.App.1959); Krauskopf, Products Liability, 33 Mo.L. Rev. 24 (1968).

The question of the recovery of consequential damages under strict liability was originally discussed by the California Supreme Court in Seeley v. White Motor Co., 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (Cal.1965) (en banc). There, the primary distinction was drawn between tort recovery for physical harm and property damage and an action in warranty to recover for economic loss. The theory is basically that the law of warranty still governs the economic relationship between the parties. Many decisions have followed *Seeley*. *See* Bright v. Goodyear Tire & Rubber Co., 463 F.2d 240 (9th Cir. 1972); Southwest Forest Industries, Inc. v. Westinghouse Electric Corp., 422 F.2d 1013, 1020 (9th Cir.), cert. denied, 400 U.S. 902, 91 S.Ct. 138, 27 L.Ed.2d 138 (1970); Noel Transfer & Package Delivery Service, Inc. v. General Motors Corp., 341 F.Supp. 968 (D.Minn.1972); Farr v. Armstrong Rubber Co., 288 Minn. 401, 179 N.W.2d 64 (1970); Melody Home Mfg. Co. v. Morrison, 455 S. W.2d 825 (Tex.Civ.App.1970). *Contra*,

Santor v. A & M Karagheusian, Inc., 44 N.J. 52, 207 A.2d 305 (N.J.1965).

The cases where the damage has been limited to the "loss of the bargain" have generally been strictly commercial transactions involving parties in privity, sometimes with disclaimers, or where the subpurchaser or the ultimate consumer is involved the claim for relief has been based solely on economic loss without accompanying damage to the plaintiff's other property.[8] We are not here dealing with the typical "loss of bargain" issue. There is no claim that loss of profits were caused by the defective heater inadequately heating the building or that the plaintiffs incurred damages from loss of use of the heater. *Cf.* Seeley v. White Motor Co., 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965) (en banc) (loss of profits claimed from defective truck). Here the defective heater burned plaintiffs' building and disrupted their business for eight months. Loss of profits by reason of the tortious destruction of the plaintiffs' business was a foreseeable damage ordinarily cognizable in tort liability and therefore we find it to be compensable under Missouri law.[9] See Restatement of Torts §§ 927 and 928 (1939).[10]

The judgment is affirmed.

7. The claim of implied warranty and one in strict liability are said to be treated alike, at least in Missouri. Keener v. Dayton Electric Mfg. Co., 445 S.W.2d 362, 364 (Mo. 1969).

8. An excellent discussion of the problem of consequential damages in strict liability cases is found in Note, Economic Loss in Products Liability Jurisprudence, 66 Colum.L. Rev. 917 (1966).

9. Although loss of profits was denied because of inadequate proof, in Jack L. Baker Companies v. Pasley Mfg. & Distrib. Co., 413 S. W.2d 268 (Mo.1967), a negligence suit involving an explosion and fire, the Supreme Court of Missouri said:

The rule in this state with respect to loss of anticipated profits resulting from actionable conduct of another is that they "are recoverable only when they are made reasonably certain by proof of actual facts which present data for a rational estimate of such profits." Yaffe v. American Fix-

ture, Inc., Mo., 345 S.W.2d 195, 199. In Tnemec Company, Inc. v. North Kansas City Development Co., Mo., 290 S.W.2d 169, 174, this court stressed that the evidence must be sufficiently definite and certain for the jury to make a reasonably accurate estimate of the loss without resorting to speculation. The court said: "This court and the court of appeals of this state have been strict in evaluating the sufficiency of the evidence warranting a recovery of damages for loss of profits. Our courts have refused to permit a jury to speculate, without substantial basis, as to what might be probable or expected profits as an element of damages."
*Id.* at 270. *See also* Conley v. Kansas City Ry., 259 S.W. 153 (Mo.App.1924); Smith v. Chicago & A. Ry., 127 Mo.App. 160, 105 S. W. 10 (1907).

10. Section 927 provides that:
Where a person is entitled to a judgment for the conversion of a chattel or the destruction of any legally protected interest

BRIGHT, Circuit Judge (dissenting).

Only rarely and with great reluctance do I ever vote to overrule a jury verdict in a civil case, but I would do so here to avoid an obvious miscarriage of justice.

The manufacturer, Dover Corp., did not supply the heater in the condition which allegedly caused the fire in plaintiff's store building. Dover supplied its wholesaler, Iowa Plumbers Supply, with a 300,000 BTU Peerless *natural gas* heater. When Iowa Plumbers received an order from Green Colonial, Inc., a supplier of heating units, to supply a 300,000 BTU *propane* heater to Harold Munroe, a plumber servicing plaintiff's store, it sent the natural gas heater and a *conversion unit* which Dover supplied *for customers but which it did not manufacture.* Green Colonial passed this unit on to the plumber, Munroe, who attempted to make a proper installation.

The record shows the plumber, Munroe, to have been less than an able artisan. When the time came in the fall of the year to light the heater which had been installed during the prior summer, the local propane distributor, Solar Gas Company, discovered that the plumber had connected the natural gas heater to the propane gas line without installing the conversion kit—creating an extremely dangerous situation. The propane serviceman disconnected the heater from the gas service. Plumber-Monroe then ordered a second conversion kit from his supplier, Green Colonial, and made the installation.

Although the plaintiffs complained of the operation of the heater, the plumber upon learning of this "trouble" with the heater, sought to make adjustments himself without advising his supplier. Munroe asked the propane gas serviceman to check the pressure. The latter found the pressure high in his estimation and turned down the pressure valve, reducing the gas pressure to the heater.

Credible expert testimony indicated that the gas serviceman should have increased rather than decreased the pressure in the line. Finally, the undisputed testimony established that the plumber upon installing the smaller orifices in the heater during conversion to propane gas use failed to properly align these orifices on an equal plane.

What we have here is the case of a manufacturer being held liable for merely supplying a heater—approved by industry standards—which others altered, installed, and serviced. It seems to me that the doctrine of strict liability should not apply in such a case, unless plaintiff establishes that a defect existed in the heater when it left the plant.

The existence of such a defect rests solely on the testimony of plaintiff's expert, Alfred Benberg. The majority aptly and properly characterizes his air-adjustment theory as "confusing" and "insufficient to sustain the verdict." Nevertheless, the majority finds a basis for the verdict in the same witness' testimony that the absence of a flame tube constituted a factory defect which caused the explosion in the heater.

The flaw in witness-Benberg's analysis is that, while criticizing the absence of the flame tube, he made no comment concerning the alternate method chosen by Dover to quickly spread the flame in

in land or other thing, the damages include

(a) the exchange of value of the subject matter or the plaintiff's interest therein at the time and place of the conversion or destruction, or a different value where that is necessary to give just compensation, and

(b) the amount of any further *loss suffered* as the result of the deprivation, and

(c) interest from the time at which the value is fixed or compensation for the loss of use.

Section 928 provides that:

Where a person is entitled to a judgment for harm to chattels not amounting to a total destruction in value, the damages include compensation for

(a) the difference between the value of the chattel before the harm and the value after the harm or, at the plaintiff's election, the reasonable cost of repair or restoration where feasible, with due allowance for any difference between the original value and the value after repairs, and

(b) the loss of use.

its Peerless heaters. Dover's chief engineer and a designer of the Peerless heater testified without dispute that the Peerless heater contains a form of flame tube, a continuous row of "carry-over ports" running the total length of the heater. He further testified that a prototype of the Peerless heater was tested under standards of the industry as promulgated by the American Gas Association. The heater met the standard for ignition of main burners and was certified as meeting industry standards including national safety standards. Witness-Benberg simply failed to recognize the existence of a flame tube differing in construction from flame tubes on other heaters with which he apparently was familiar. The Benberg testimony thus does not represent sufficient evidence on which to sustain this verdict.

A representative of the American Gas Association (testing) laboratories testified:

Q. Now, do you have a standard there by which this heater was tested that has to do with the operation and the ignition of the main burners? A. Yes, that would be covered in the ignition test that we conduct. For example, under Section 2.5.2 there is this standard or this provision, "The arrangement of main burners, burner valves and pilot burners shall be such that when only the pilot burners are in operation the gas from any burner or combination of burners will be effectively ignited without delayed ignition, flashback or danger to the appliance under the condition of tests specified under 2.5.1, Clauses A to D, inclusive."

Q. Now, before you go on, Mr. Kampman, was this heater tested against that standard in the laboratory of the American Gas Association? A. That prototype was tested, yes.

Q. Right. And did it pass the test? A. It did.

Judges properly should give the juries great leeway in assessing the experts' opinions. But in cases, such as this one, where the expert's testimony gives an opinion ignorant of the actual operation of the product in question, the opinion, must be ignored and a verdict, resting wholly on such opinion set aside.

I conclude that plaintiff presented no evidence of probative weight showing the heater to be defective when it left the factory. Thus, I find no basis to assess any liability against appellant-manufacturers or the appellant-suppliers. I would reverse the judgment.