GENERAL MOTORS CORPORATION
et al., Appellants,

v.

R. M. HOPKINS, Jr., Appellee.

No. 16642.

Court of Civil Appeals of Texas,
Houston (1st Dist.)

Feb. 19, 1976.
Rehearing Denied March 18, 1976.

Vinson, Elkins, Searls, Connally & Smith, B. Jeff Crane, Jr., Simon M. Frank, Daniel A. Hyde, Francis E. McGovern, Harry M. Reasoner, Eleanor S. Glass, Houston, for General Motors; Frazer F. Hilder, Thomas W. Watkins, Detroit, Mich., of counsel.

Vincent W. Rehmet, Houston, for appellant Bud Moore Chevrolet, Inc.; Barrow, Bland & Rehmet, Houston, of counsel.

Kronzer, Abraham & Watkins, W. W. Watkins, W. James Kronzer, Houston, for appellee.

EVANS, Justice.

This is a products liability case. The appellee, Robert M. Hopkins, Jr., suffered severe neck injuries, which rendered him a quadriplegic while riding as a passenger in a 1970 Chevrolet pick-up truck being driven by his friend, James Roy Averyt. The truck in question had been purchased by Hopkins from appellant Bud Moore Chevrolet, Inc. approximately eleven months prior to the date of the accident. It was equipped with a quadrajet carburetor designed and manufactured by appellant General Motors Corporation. It is Hopkins' contention that by reason of the defective design of the quadrajet carburetor, the vehicle continued to accelerate in speed notwithstanding Averyt's release of the accelerator pedal.

On jury findings that the carburetor was defectively designed and that such defect was a producing cause of the occurrence, the trial court entered judgment against appellants, General Motors Corporation and Bud Moore Chevrolet, Inc., jointly and severally, for the total sum of $1,760,000.00. It was also adjudged that Bud Moore Chevrolet have judgment against General Motors for full indemnification. Bud Moore Chevrolet has adopted in full General Motors' nine points of error.

In its first four points of error General Motors attacks the legal and factual sufficiency of the evidence to support the jury's findings of defective design and producing cause. In reviewing its legal sufficiency points we have considered only the evidence and inferences therefrom which support the jury's findings. In reviewing its factual sufficiency points we have considered all of the evidence.

The accident occurred on June 11, 1971, about 9:30 p.m. In the late afternoon of that day 19 year old Robbie Hopkins had driven his pick-up truck from Houston to Port Bolivar in Galveston County, Texas, for the purpose of transporting certain work tools to his family's cottage. He was accompanied by his friend, James Roy Averyt. Shortly prior to the accident, Averyt and Hopkins decided to return to Houston by taking the Galveston Ferry from Port Bolivar. Averyt drove the truck (with Hopkins as passenger) from the Hopkins cottage to Overton Street, then turned right on Overton and proceeded through Port Bolivar at approximately 35 miles per hour. At the end of Overton Street the road curved sharply to the left and there was a single lane wooden bridge over a water crossing. Averyt testified that in order to negotiate this curve and bridge he shifted down to second gear and slowed to a speed of 10 to 20 miles per hour. After crossing the bridge Averyt proceeded along Old Frenchtown Road which at that time and location was shelled, bumpy and "real rough." There was a straight stretch of Old Frenchtown Road 250 to 300 yards in length from the bridge crossing to a sharp 90° curve to the right where the accident happened. Averyt testified that on this stretch of road he accelerated to a speed of 30 to 35 miles per hour but did not shift from second to third gear. In order to pick up speed Averyt punched down on the accelerator pedal and then let up on it. He punched it again "just . . . maybe jacking around" and let up on it again, expecting the truck to "gear itself down." At this point he was "coming into the curve" and the vehicle "just jumped away." He made an attempt to apply the brakes and clutch but was unable to control the vehicle. The truck proceeded on its straight path through the curve and after leaving the road turned over several times. Averyt testified that when he depressed the clutch he heard "a loud roar of the engine." Averyt was thrown from the vehicle and suffered a leg injury. Hopkins' neck was broken by the impact of turning over and he had to be removed from the floor board

of the vehicle. Hopkins testified he became alarmed when he could see they were going too fast to make the curve. He said he looked over at Averyt and that Averyt looked "at me as if I were doing it." He said Averyt looked "lost, completely bewildered." Hopkins said he then looked down at the floor board and saw that Averyt's foot wasn't even on the accelerator. Hopkins said he dove across the seat and put his hand on the accelerator to try "to jiggle it" believing it was stuck and then he heard the engine "really take off." It sounded "like an airplane taking off." He said he then reached for the ignition key but was unable to turn it off in time to avoid the accident.

The quadrajet carburetor is a complex assembly of related parts, the collective function of which is to supply a proper mixture of air and gasoline into the engine's combustion chamber. As the name "quadrajet" implies, there are four passages or "barrels" through which the flow of air is directed. This air flow is controlled by certain "butterfly" type valves which are opened and closed according to varying engine conditions. Generally speaking, the greater the amount of air and gasoline which flow through this system and the greater the ratio of air-to-gasoline, the higher degree of efficiency and acceleration achieved. For cruising and lower driving speeds, only the two "primary" valves are activated. The driver may, however, obtain additional bursts of power, as when passing another vehicle, by sharply depressing the accelerator pedal and thus activating the two "secondary" valves. In order to prevent the "secondaries" from opening at unintended times, as when the engine is idling, the quadrajet carburetor utilizes an external "lock-out" system. Simply stated, the "secondaries" are "locked out" (i. e., maintained in a closed position) by a pivoting lock-out pin which is attached to the secondary valves. This pin rotates and except when driving conditions require opening of the secondary valves, the pin is positioned or "locked" under the "lock-out lever." Both the lock-out pin and the lock-

out lever are located outside the carburetor housing and are not encased within the enclosure. Thus, these parts are not protected from the elements and may be seen by looking under the hood of the engine. It is essentially Hopkins' contention that by reason of the defective design of the carburetor assembly, the lock-out pin was permitted to "hang" on top of the lock-out lever with the secondaries open, instead of returning to its position below the lever, so that the secondaries became "locked open" and the vehicle continued to accelerate in speed notwithstanding Averyt's release of the accelerator pedal.

General Motors contends that there is no evidence in the record from which the jury could have found that the design of the quadrajet carburetor created an unreasonable risk of harm. It argues that out of some 15,000,000 such carburetors designed and manufactured, some 3,000,000, of which were equipped with a lock-out system of the type installed on the Hopkins vehicle, the claim of defective design asserted by Hopkins is unique and that all of the credible evidence conclusively shows that the system could not have malfunctioned as Hopkins claims.

■ In our opinion there is evidence in the record which would support the jury's findings that the carburetor was defectively designed and that such defect was a producing cause of the occurrence.

There was testimony that several weeks prior to the accident, Hopkins, while driving the truck, had a similar experience. On that occasion Hopkins had turned onto Fulton Street in Houston, Texas. Riding as a passenger with him was his friend, Roy Averyt. Hopkins testified that when he pushed down on the accelerator to obtain speed and then released the pedal, the truck's speed did not decrease, but instead the truck took off "in a roar." Since he was on a straight stretch of road, Hopkins was able to bring the truck to a stop by applying his clutch and brake. He and Averyt then dismounted from the truck and were examining the engine, when they were noticed by a mechanic, William Prime,

who was also a friend of Hopkins, who happened to be driving along Fulton Street. Prime stopped his car and after determining that the accelerator linkage was functioning in a normal manner, suggested that Averyt get in the truck and start the engine. When Averyt started the engine it began to race notwithstanding Prime's manual operation of the accelerator linkage. Averyt then turned off the ignition and Prime again examined the engine to determine the cause of the problem. During this examination, Hopkins asked Prime whether the fact that the lock-out pin was positioned on top of the lock-out lever could be the cause, although Hopkins was not then aware of the function of such parts or their correct names. Prime then worked the accelerator linkage back and forth a number of times and the lock-out pin returned to its position below the lock-out lever. Prime testified he was unable to make the pin "hang" again on top of the lever but that before he manually released the pin from its position on top of the lever, he looked down the carburetor barrels and noticed that the secondaries were partially opened.

After the accident Prime went out to the Hopkins house to look at the truck for the specific purpose of determining whether the secondary valves in the carburetor were open. He testified that when he first looked at the carburetor, the lock-out pin was positioned on top of the lock-out lever and the secondaries were open approximately one-third. The jury could have concluded from this testimony and from photographs taken of the carburetor system after the accident that at the time of the accident the lock-out pin was positioned on top of the lock-out lever and that the secondary throttle valves were thereby "locked open." There was also testimony from which the jury could have concluded that when the secondary valves were opened approximately one-third, the speed of the vehicle in second gear could reach and exceed 70 miles per hour.

General Motors offered extensive testimony tending to prove that the secondary

valves could not be "locked open" during driving conditions. Mr. Donald Stoltman, an engineer-employee of General Motors, who had obtained patents on the quadrajet carburetor, testified that it was virtually impossible for the lock-out pin to get on top of the lock-out lever during driving conditions, even when the choke rod was not properly attached. Stoltman testified that such an occurrence might be conceivable in a "cold engine" situation but that under driving conditions it was contrary to the laws of physics and the mechanical operation of the carburetor parts for the pin to get on top of the lever. Another engineer-employee of General Motors, Arthur Van Stellandt, testified to the effect that actual road tests with a mounted camera on a truck driven over a bumpy road proved there was not enough freedom of movement in the mechanism to permit the pin to get on top of the lever. Based upon this and other testimony General Motors contends that it is a "physical, mechanical and theoretical impossibility" for the lock-out pin to hang on top of the lock-out lever during warm engine operation, at least with the choke rod attached.

While the testimony offered on behalf of General Motors did tend to establish the improbability of the occurrence of this condition during normal driving circumstances, there was evidence, which, if believed by the jury, tended to show that such phenomenon was possible. Mr. Lavert LaRue, a mechanic called as a witness on behalf of Hopkins, testified that if the lock-out pin and lock-out lever were clean, it would be very difficult for the pin to hang on top of the lever. However LaRue testified that a minimal amount of grit or other granular substance might cause the mechanism to "drag" in such a manner that the pin would hang on top of the lever. Indeed, one of General Motors' own expert witnesses, Mr. Theodore A. Redman, conceded this possibility.

"Question: You can see how if grit or a granular substance accumulated on top of the lock-out lever and existed between the lever and the bottom of the lock-out pin, that could also add to the drag-factor and cause the pin and lever to jam?

"Answer: It would certainly act as a drag factor, yes.

"Question: There is no question about that, is there?

"Answer: No, sir."

A side view photograph of a similar quadrajet carburetor tested at the General Motors' Milford Proving Grounds in Michigan was identified by LaRue as evidencing the same "problem" (i. e., the secondary lock-out pin "hung" on top of the lock-out lever) which he had observed with the Hopkins carburetor. LaRue testified that the two lock-out systems appeared "to be hung identically in the same way." Despite testimony to the effect that the gravitational and mechanical forces upon the lock-out system usually returned the secondary pin to a position below the lever, there was also testimony that the secondary pin could bypass the lever as a result of engine vibrations resulting from a rough and bumpy road. Based upon Mr. LaRue's testimony and that of two other Hopkins witnesses, Mr. Lloyd Koenig and Dr. Douglas F. Muster, and upon evidence obtained from General Motors' own files and witnesses, the jury could have concluded that it was possible to hang the lock-out pin on top of the lock-out lever during driving conditions and while the secondary valves were in an open position.

There was also evidence from which the jury could have concluded that at a date well prior to the sale of the truck in question, General Motors was aware of this problem and that by a reasonable cost expenditure it could have timely designed and manufactured a ramp type lock-out lever which would not permit a recurrence of the situation. Intercompany records of General Motors show that on May 21, 1969, more than a year prior to the date Hopkins purchased the 1970 pick-up truck, one of its engineers, Mr. George Polen, wrote a letter to another engineer-employee, Mr. Theodore Redman, explaining that the secondary lock-out system in his chief engineer's automobile had "jammed and held the second-

ary valves approximately ⅓ open . . ." Mr. Polen stated that "the system had been successfully locking out the secondaries prior to this problem" and that the problem had occurred when the accelerator pedal was released "and the 'secondary pin' locked itself above the 'lock-out' lever." Mr. Polen further stated that several production carburetors had been checked and no alignment problems were found, but that it was possible to "stick" the pin above the lever. Polen asked Mr. Redman what design proposals were available to prevent the secondaries from "sticking open" if the pin did pass by the lever and stated his belief that a redesign was required to prevent any possibility of the secondaries being held open. Mr. Polen further stated that the condition had been observed on the problem car because of a "hard start" complaint, but he concluded that the "condition would also be a safety problem."

On the same date that Mr. Polen wrote this letter to Mr. Redman, he also called him on the telephone. Mr. Redman testified that Mr. Polen's main concern during the telephone conversation was the fact that the pin could become positioned on top of the lever and "hang the secondary throttles." He testified that Mr. Polen's primary concern was related to the safety factor, rather than to whether the car would start easily.

"Question: Did you get the impression that Mr. Polen's concern was really related to safety rather than whether the car would start?

"Answer: Yes.

"Question: You could understand that, being a carburetor man?

"Answer: Yes.

"Question: For if that pin and lever jammed in the open position and stayed that way, it could cause that car to run at a fast rate of speed?

"Answer: Yes.

"Question: And stay that way?

"Answer: Yes.

"Question: And create hazards to people who operated that car under certain circumstances?

"Answer: Yes.

"Question: And that needed to be eliminated as far as possible?

"Answer: Yes.

"Question: And one way to eliminate it was to design this lock-out lever in such a way as to have a 45 degree ramp on the end of the lock-out lever instead of a radius?

"Answer: It would in our opinion be an improvement.

"Question: And far add to the safety of the product?

"Answer: It would add to the safety of the product.

"Question: And you wouldn't have modified it if it had went in the other direction, would you?

"Answer: No, sir."

Also on May 21, 1969, Mr. Sy Seigel, a design engineer for General Motors, distributed to Mr. Polen and others in General Motors an illustrated redesign of the lock-out lever "to eliminate the possibility of catching the pin and the secondary throttle shaft on top of the lock-out lever." Mr. Seigel explained that this was accomplished by adding a steep "ramp" on the top of the lock-out lever, just above the notch where the lever engaged the pin. Thus, if the pin should get positioned on top of the lever, the ramp would cause it naturally to slide off of the lever. According to Seigel this ramp "makes it practically impossible for the pin to hang up on the lever." Thereafter, on July 16, 1969, Mr. Reed Brown, another design engineer for General Motors, sent a telegram to Polen recommending approval of the lock-out lever system as designed because "it is a safety related item." By letter of the same date Brown wrote to Polen "urgently requesting your immediate approval of our throttle valve lock-out system . . ." On July 29, 1969, Mr. Redman wrote to Mr. Polen stating that in response to Polen's telephone request, he, Redman, wished to review the work done on the lock-out lever to prevent secondary throttle valve opening during cold operation. That he had "two known cases of sticking secondary throttles" due to

the lock-out lever being positioned under the pin. That prior to Polen's letter of May 21, they had a design revision tested and in their cost system. That in each of the two cases the lock-out lever "was bound by corrosion, and in some fashion got under the pin which didn't have sufficient force to move the bound lever and allow the secondaries to return to the closed position."

Subsequent intercompany correspondence and memoranda concerning these design changes indicate that the proposed redesign of the lock-out system would have resulted in a per-unit increase of .011 dollar, a tooling charge of $7,700.00 and would have required an estimated "lead" time of 19 weeks for tooling.

The evidence further established that the redesigned lever was first incorporated into an assembled quadrajet carburetor on June 10, 1970. Mr. LaRue testified that after the lock-out lever was so modified, the pin would hit the lever at a different angle and could not hang on top of the lever notwithstanding the presence of grit or other foreign substance. He testified that with such modification the lock-out pin would "always snap back, consequently you can't hang the rear barrels open." Dr. Douglas Muster, a witness called on behalf of Hopkins, testified that the modification of the lock-out lever was "a relatively easy way to fix" the problem and that the ramp design on the lever prevented the lever from being under the pin "so that it is really a fail-safe feature."

The trial of this cause commenced on October 30, 1974, and lasted until December 6, 1974. During this period of time the jury heard from more than 40 witnesses. The statement of facts is some 4796 pages in length. The great bulk of this testimony pertains to the working of the carburetor system. The evidence as to whether and under what circumstances the secondary valves might be "locked open" was quite persuasively evaluated by expert witnesses for both parties.

The jury was, of course, entitled to accept that testimony which it found to be most relevant and believable and to reject testimony to the contrary, including that of the expert witnesses. Thus, the jury was entitled to believe the testimony of the witnesses who stated that they had examined the Hopkins carburetor after the accident and found the lock-out pin positioned on top of the lock-out lever. They were entitled to consider the post-accident photographs of the Hopkins carburetor as visual proof that at the time of the accident the lock-out pin had jammed on top of the lock-out lever with the secondary valves in an open position. The jury was also entitled to accord weight to the documentary evidence taken from General Motors' own records which tended to show that prior to the accident General Motors had determined not only that such malfunction could and had occurred but that it could be prevented by a relatively simple and inexpensive redesign of the lock-out lever. From all of the evidence the jury could have concluded that the General Motors design created an unreasonable risk of harm to its users. We hold that there is evidentiary support for the jury's findings that the product was defectively designed and that such defect was a producing cause of the occurrence. We further hold that such findings are not against the great weight and preponderance of the evidence. Appellants' points of error 1 through 4 are overruled.

In its next four points of error General Motors asserts that the trial court erred in disregarding the jury's findings with respect to the defense of misuse.

Subsequent to the incident on Fulton Street, but prior to the date of the accident, Robbie Hopkins decided to remove the original quadrajet carburetor from his truck and to replace it with a "Holly" carburetor, which he had purchased from a friend, Lane Matthews. Hopkins had decided to replace the quadrajet with a Holly in order to increase the speed and efficiency of the truck. Hopkins, together with Matthews and Averyt, removed the quadrajet from the truck manifold and using an adaptor plate, installed the Holly in its place. About a week later Hopkins decided to remove the Holly

and reinstall the quadrajet because the Holly was causing his engine to "flood out." Hopkins then removed the Holly and the adaptor plate from the manifold and replaced it with the original quadrajet. It is the contention of General Motors that this reinstallation was a "butchery" of its engineered carburetor system and that in making such reinstallation, Hopkins altered the originally installed carburetor system as follows: (1) by failing to connect the choke rod; (2) placing the thermostatic coil cover on backwards and in raised position; (3) "Burring" the end of the lock-out pin; (4) improperly connecting the distributor spark advance vacuum hoses; (5) using a nail instead of a cotter pin in the main accelerator rod linkage; (6) and (7) using improper gasket materials between the carburetor and the manifold; (8) using improper bolts and screws to mount the carburetor to the manifold; (9) using a rubber hose instead of a metal hose to connect the gasoline line; (10) using wire instead of clamps to attach gasoline line; and (11) stretching and reversing the accelerated return spring.

The jury found that the manner in which the carburetor was reinstalled by Hopkins constituted a material misuse of the vehicle and that such misuse was "a producing cause" of the occurrence in question. Misuse was defined as meaning "a use of the vehicle in which it is mishandled in a way which the manufacturer could not have reasonably foreseen or expected in the normal and intended use of such vehicle."

General Motors argues that such findings bar Hopkins' recovery as a matter of law and also that such findings are in such direct conflict with the jury's findings of defective design and producing cause that the verdict will not support the entry of judgment for either party.

 It is the duty of the courts to reconcile apparent conflicts in jury findings, if that can reasonably be done, and the findings should not be held irreconcilable unless when considered separately and taken as true, they would require the rendition of different judgments. *Texas & P. Ry. Co. v. Snider*, 159 Tex. 380, 321 S.W.2d 280

(1959). In construing the findings in the instant case, we consider all of the issues together and are aided by all relevant evidence presented upon the trial. McDonald, Texas Civil Practice, Vol. 3, Sec. 15.06.1, p. 606.

We first note that the jury failed to find that the carburetor was defectively manufactured, but did find that it was defectively designed. It also found that the manner of reinstallation was "a producing cause" of the occurrence but it failed to find that this was the "sole producing cause." The term "producing cause" was defined as an "efficient, exciting or contributing cause, which in a natural and continuing sequence, caused in whole or in part the occurrence . . . and but for said cause the occurrence . . . would not have occurred." The jury was also charged that there might be more than one producing cause and only one sole producing cause. The jury failed to find that Hopkins voluntarily assumed the risk of the defective product with knowledge and appreciation of its defective condition.

In reviewing the record we find evidence from which the jury could have concluded that the choke rod was disconnected from the carburetor system at the time of the accident. There was also testimony that when the choke rod was disconnected the choke could be "blown open" under such circumstances that the lock-out pin could be positioned on top of the lock-out lever with the secondaries open. On the basis of this testimony, the jury could have decided that the disconnected choke rod was a contributing factor in the malfunction of the carburetor system.

We find no evidence that Hopkins was responsible for the burr on the end of the lock-out pin; nor, in our opinion, was there legally sufficient evidence that any of the other alleged alterations contributed to the defective functioning of the lock-out system. There was some testimony that improper replacement of the thermostatic coil cover might wedge the lock-out lever so that it would not be able to move out of the way of the lock-out pin, and that the use of

a nail, instead of a cotter pin, in the main accelerator rod linkage, or the use of non-factory items such as gasket materials, bolts and screws, could cause the secondaries to become bound in the open position. However, we find no evidence that any of the alleged alterations (other than the disconnected choke rod) could have been a producing cause which, concurrently with the defective design of the lock-out lever, resulted in a failure of the lock-out system.

■■■ We may presume that the jury did not intentionally make conflicting findings on the issues of design defect and misuse. *Casualty Underwriters v. Rhone,* 134 Tex. 50, 132 S.W.2d 97 (1939). As we have stated, the jury could have determined that the choke rod was disconnected at the time of the accident and that this resulted from Hopkins' carelessness in reinstalling the quadrajet carburetor. It could also have determined from the testimony that this condition facilitated the lock-out pin becoming positioned on top of the lock-out lever with the secondaries held open. Under the court's charge and based upon the evidence before it, the jury could reasonably have concluded that there was both a design defect and a misuse of the product, each of which contributed to and was a producing cause of the accident. While, as stated above, the jury could have decided that Hopkins' failure to connect the choke rod contributed to the occurrence, it could also have decided that the defective design of the lock-out lever created an unreasonable risk of harm to the user and that such defect was also a producing cause of the occurrence. Thus we hold that the jury's findings on these issues are not in irreconcilable conflict. *Exxon Corp. v. Butler Drilling Co.,* 508 S.W.2d 901, 904 (Tex.Civ. App.—Houston [1st], 1974, ref'd n. r. e.).

In the recent case of *Rourke v. Garza,* 530 S.W.2d 794, 799 (Tex.1975), the Texas Supreme Court stated:

"The determination of whether a product is defective must be made in light of the normal uses of the product; and where it is misused, strict liability does not apply. *Helicoid Gage Division of*

*American Chain and Cable Co. v. Howell,* 511 S.W.2d 573 (Tex.Civ.App.—Houston [14th] 1974, writ ref. n. r. e.); *McDevitt v. Standard Oil Company of Texas,* 391 F.2d 364 (5th Cir. 1968); Restatement (second) of Torts § 402A, comment *h* (1965)."

The comment referred to in the Restatement is set forth below:

"h. A product is not in a defective condition when it is safe for normal handling and consumption. If the injury results from abnormal handling, as where a bottled beverage is knocked against a radiator to remove the cap, or from abnormal preparation for use, as where too much salt is added to food, or from abnormal consumption, as where a child eats too much candy and is made ill, the seller is not liable."

■■■ The fact that a consumer does not use a defective product in the exact manner contemplated by the supplier or with the same degree of care as a prudent person will not preclude his recovery under the theory of strict liability where the product was defective when supplied. *Shamrock Fuel & Oil Sales Co. v. Tunks,* 416 S.W.2d 779 (Tex.1967); *Pizza Inn, Inc. v. Tiffany,* 454 S.W.2d 420, 424 (Tex.Civ.App. —Waco, 1970, no writ). There is no longer any doubt in our jurisdiction that contributory negligence is not a defense to an action based upon the theory of strict liability. *Henderson v. Ford Motor Co.,* 519 S.W.2d 87 (Tex.1974).

Section 402A, comment g, of the Restatement provides that in order for the section to be applicable the injured plaintiff must prove that at the time the product left the producer's hands it was "in a condition not contemplated by the ultimate consumer which will be unreasonably dangerous to him." The comment further provides that when a product is delivered in a safe condition, the producer is not liable if "subsequent mishandling or other causes" make it harmful by the time it is used.

In its charge to the jury the court instructed that the term "unreasonable risk of harm" meant that the product, as designed, threatened harm to persons using

the product to the extent that it would not be placed in the channels of commerce by a prudent manufacturer aware of the risk involved in its use "and" to the extent that, as manufactured, it would not meet the reasonable expectations of the ordinary consumer as to safety. See *Henderson v. Ford Motor Co.*, supra, at page 101. The jury found upon satisfactory evidence that the defective design of the quadrajet carburetor's lock-out lever created an unreasonable risk of harm to the user at the time the product was delivered and that this defect, and not merely Hopkins' manner of use, was a producing factor of the occurrence. The jury was at liberty to conclude from the evidence, under the instructions given by the court, that the accident would not have occurred except for the defective design of the lock-out lever and that this defect existed at the time the product left the supplier's hands.

We believe the evidence supports the findings of the jury, implicit in its verdict, that General Motors was aware of the risk to the user involved in the design of its lock-out system and that such design would not meet the reasonable expectations of the ordinary consumer as to safety. Hopkins, therefore, met his threshold burden of proving the defective condition of the product at the time it left the hands of the producer, and the issue of subsequent mishandling became a question of causation. *Dennis v. Ford Motor Co.*, 471 F.2d 733 (3rd Cir. 1973).

A product which is found to contain an unreasonably dangerous defect at time of delivery under § 402A, and which defect is a producing cause of injury to the user, may result in the producer's liability under the doctrine of strict liability, even though some intervening act unanticipated by the producer contributes to the accident. In *Bradford v. Bendix-Westinghouse Auto. Air Brake Co.*, 33 Colo.App. 99, 517 P.2d 406 (1973), the Colorado Court of Appeals, at page 413, stated:

"Section 402A does recognize a defense for the manufacturer where the consumer or user mishandles or misuses the product and thereby *creates* the dangerous condition. Primarily this defense is intended to protect the manufacturer from becoming an absolute insurer for all injuries arising out of the use of his product. The usual situation in which the defense will arise is where the product is being used in a way in which it was not intended to be used. However, a prerequisite for the defense is that the product must have been in a safe condition when it reached the user. If it was unreasonably dangerous at that time, the 'intervening' acts of the user can only be additional proximate causes making the two parties joint tort-feasors . . .

"Of course, the defect in the product must itself be a proximate cause of the plaintiff's injury before the plaintiff can recover. The manufacturer could not be held liable simply because of the existence of the defect when the real cause of the accident was the conduct of the user of the product. Only in this sense can the manufacturer be relieved of liability due to the acts of the user or a third party."

In the case before us the jury failed to find that Hopkins' "misuse" in reinstalling the quadrajet carburetor was the "sole" producing cause of the occurrence. The quadrajet carburetor continued to function, notwithstanding the fact that the choke rod was disconnected, and there was testimony, including that of a General Motors witness who had worked as a Chevrolet dealer mechanic for 26 years, that it was not unusual for Chevrolet vehicles to be driven with the choke rods disconnected. According to this and other testimony, the jury could have decided that choke rods are not essential to the normal driving of the vehicle and that they may come loose or be left disconnected through regular servicing of the automobile.

Since the jury found only that Hopkins' "misuse" of the product was a producing cause of the occurrence, and failed to find that such misuse was the sole producing cause, its finding of misuse does not, in our opinion and upon the facts of this case,

preclude Hopkins' recovery. *Bradford. v. Bendix-Westinghouse Auto. Air Brake Co.,* supra; *Hales v. Green Colonial, Inc.,* 490 F.2d 1015, 1021 (8th Cir. 1974).

If the user's negligence or careless handling "plays some part" in but does not in itself create the condition which causes the accident, the supplier of a dangerously defective product may not be relieved of liability if in fact the defect is a producing cause of the occurrence. *Henderson v. Ford Motor Co.,* supra; *Pizza Inn, Inc. v. Tiffany,* supra; Products Liability: "Alteration of Product After It Leaves Hands of Manufacturer or Seller as Affecting Liability for Product-Caused Harm," 41 A.L.R.3d 1251, § 2. See also Frumer and Friedman, "Products Liability" (1975), Sec. 16A(4), pp. 3–352 et seq.; Noel, "Defective products: Abnormal Use, Contributory Negligence and Assumption of Risk," 25 Vanderbilt Law Review 93, 96 (1972); 63 Am.Jur.2d, "Products Liability," Sec. 136, pp. 143–5; Epstein, "Products Liability: Defenses Based on Plaintiff's Conduct" (1968), Utah Law Review 267, 273.

In *Findlay v. Copeland Lumber Co.,* 265 Or. 300, 509 P.2d 28, 30–31 (1973), the Oregon Supreme Court stated:

". . . As we understand comment h, to Section 402 A, 'abnormal' use does not mean every instance of negligence, however slight, in connection with the use of the product. The product must be safe for 'normal' handling and consumption. Misuse, to bar recovery must be a use or handling so unusual that the average consumer would not reasonably expect the product to be designed and manufactured to withstand it—a use which the seller, therefore need not anticipate and provide for . . ." [509 P.2d, at p. 31.]

The jury's findings on the issues of defective design established, in our opinion, the "ultimate" and "controlling issues" in the case. *McElwrath v. City of McGregor,* 58 S.W.2d 851 (Tex.Civ.App.—Waco, 1933, writ dism'd). The trial court properly disregarded as immaterial the jury's findings on the issues of misuse which established only a concurrent cause of the accident. See McDonald, Texas Civil Practice, Vol. 3, Section 15.06.5, pp. 612–615. We overrule General Motors' points five through eight.

In its ninth point of error General Motors contends that the trial court erred in refusing to grant a new trial because "the jury committed misconduct that resulted in harm to the defendant." While this point is so generally stated that it affords no basis in itself for review, we have decided to consider it based upon the argument presented thereunder.

General Motors contends under this point that the jurors committed misconduct by considering the effect of their answers to the special issues; by letting bias, prejudice and sympathy play a part in their deliberations; in considering the financial condition of the parties and discussing the percentage of judgment allocable to attorney's fees; and by not allowing a member of the jury to change his vote after he had expressed a desire to do so. At the hearing of General Motors' motion for new trial testimony was taken from eleven of the twelve jurors. It appears from this testimony that the jury selected its foreperson on Wednesday afternoon and after a reading of the court's charge retired for that day. The next morning, a Thursday, the jury began to consider the issues in order and initially voted eleven to one to answer the first special issue that the carburetor was not defectively designed. After next answering the special issues relating to misuse and assumed risk, the jurors sent a note to the judge inquiring whether it was necessary that they answer the remaining issues pertaining to damages. The next morning, a Friday, the judge sent a note to the jury instructing them to answer all the issues and the jury then commenced their deliberations on the damage issues. After those issues were answered the jury returned its attention to the first special issue and after further discussion and deliberation voted ten to two to change their answer so that it read the carburetor was defectively designed. Several of the jurors testified to the effect that prior to the time the jury

sent its note to the judge, and after the other issues had been answered, one juror made a statement to the effect that "poor little Robbie will not get any money now." There was also testimony indicating that during a recess one of the jurors made a statement that General Motors had plenty of money and it was jokingly mentioned that General Motors could afford a big judgment by raising the price of each of its cars a dollar. Several of the jurors also testified that after the damage issue had been answered the statement was made that any recovery would be split between the plaintiff and his lawyers. While this and related testimony tends to show improper conduct on the part of several members of the jury, there was also testimony indicating that the verdict was not tainted by misconduct; that if such statements were made as related, they were only incidentally made within the hearing of one or two of the jurors and were made at a time and under circumstances which did not affect the course of the jury's deliberations. Similarly, while there was testimony that one of the jurors, who held the deciding vote on the first special issue, had asked the foreperson to change his vote and that the foreperson had refused to make such change, there was also testimony that such juror merely asked that another vote be taken on the issue and when the foreperson refused to take another vote the juror made no further objection and subsequently signed his name to the verdict. Furthermore, the jury was polled by the judge after the verdict was presented and the juror in question affirmed to the judge that such was his verdict.

The evidence taken upon the hearing of General Motors' motion for new trial does not conclusively establish that the jury designedly attempted to frame its answers to the issues so as to insure a recovery for the plaintiff. On the contrary, their findings with respect to the issues relating to misuse would tend to negate any such intent. The mere mention of the effect of an answer to one or more issues did not constitute such misconduct as to require a reversal of the judgment. *Trousdale v. Texas & N. O. R.R. Co.,* 154 Tex. 231, 276 S.W.2d 242, 244 (1955); *Ford v. Carpenter,* 147 Tex. 447, 216 S.W.2d 558, 561 (1949). Nor do we believe that the passing mention of attorney's fees or of the parties' financial ability to withstand judgment requires a new trial under the circumstances of this case. *City of Fort Worth v. Estes,* 279 S.W.2d 687, 689 (Tex.Civ.App.—Fort Worth, 1955, writ ref'd n. r. e.). The evidence presented on the motion for new trial was conflicting as to whether or not such misconduct did occur and in the absence of express findings we must presume that the trial court found all controverted facts in support of its determination that no misconduct occurred. We have examined the entire record, including all of the evidence presented upon the hearing of General Motors' motion for new trial, and find no evidence of jury misconduct requiring reversal of the trial court's judgment. *Fountain v. Ferguson,* 441 S.W.2d 506 (Tex.1969). General Motors' ninth point of error is overruled.

Affirmed.