**CHUBB GROUP OF INSURANCE COMPANIES, and Ringling Brothers—Barnum & Bailey Combined Shows, Inc., Ice Follies & Holiday on Ice, Inc., Sells-Floto, Inc., Appellants,**

v.

**C.F. MURPHY & ASSOCIATES, INC., J.E. Dunn Construction Co., Kansas City Structural Steel Co., Bethlehem Steel Corp., Bob D. Campbell, Ivan L. Roenigk, Don H. Luellen, Michael F. Quinlan, Ralph Keith, and City of Kansas City, Missouri, Respondents.**

No. WD 32949.

Missouri Court of Appeals,
Western District.

Aug. 16, 1983.

Shughart, Thomson & Kilroy, Kansas City, for defendant C.F. Murphy & Assoc., Inc.

Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, for defendant J.E. Dunn Const. Co.

Field, Gentry, Benjamin & Robertson, Kansas City, for defendant K.C. Structural Steel Co.

Jackson & Sherman, P.C., Kansas City, for defendant Bethlehem Steel Corp.

Linde, Thomson, Fairchild, Langworthy & Kohn, Kansas City, for defendants Campbell, Roenigk, Luellen, Quinlan and Keith.

Before NUGENT, P.J., and WASSERSTROM and KENNEDY, JJ.

NUGENT, Judge.

Plaintiffs appeal from the trial court's dismissal of counts one through five of their nine-count petition for failure to state a cause of action for damages arising from the collapse of the roof of the R. Crosby Kemper Memorial Center (hereinafter Kemper Arena). All five of the dismissed counts relate to all defendants except the city of Kansas City. Counts I and II allege negligence in the construction and design of Kemper Arena and seek recovery for the plaintiffs' loss of their right to use and occupy the arena. Count III seeks to hold the defendants strictly liable for plaintiffs' loss. Count IV alleges breach of an implied warranty of usefulness for business and entertainment, and Count V alleges that defendants negligently and recklessly misrepresented that Kemper Arena was properly designed and constructed. Counts VI through IX are solely against the city, alleging breach of contract to rent the arena, detrimental reliance on the contract, wrongful representation that the arena was free of defects, and negligent maintenance and operation of the arena. In addition to the primary issue of whether plaintiffs' petition states a cause of action, we are first faced with the question of whether the trial court's order was final and appealable. We reverse in part the trial court's dismissal

Popham, Conway, Sweeny, Fremont & Bundschu, Kansas City, for appellants.

and remand for further proceedings consistent with this opinion.

■■ On review of the trial court's dismissal of a petition, our duty is to determine if the facts pleaded and reasonable inferences to be drawn from the allegations, when viewed in the light most favorable to the plaintiffs, demonstrate any ground for relief. *DeMaranville v. Fee Fee Trunk Sewer, Inc.*, 573 S.W.2d 674, 676 (Mo.App.1978). Even if the petition is imperfectly or defectively stated, we must accept as true all facts it avers, construe all averments liberally and favorably to the plaintiffs and determine whether they invoke principles of substantive law upon which relief may be granted. *City of Kansas City v. Mary Don Co.*, 606 S.W.2d 411, 413–14 (Mo.App.1980).

Doing so, we accept as true the following facts which appear in plaintiffs' first amended petition dated October 13, 1980.

Plaintiff Chubb Group of Insurance Companies is the insurer of the other plaintiffs and is subrogated to the rights of those parties in the amount of $967,934.44. Plaintiffs Ringling Brothers-Barnum & Bailey Combined Shows Inc., Ice Follies & Holiday on Ice, Inc., and Sells-Floto, Inc. entered into an agreement with the city of Kansas City to use, possess, and occupy Kemper Arena exclusively for definite periods for the purpose of operating traveling entertainment revues and selling souvenirs and concessions.

Defendant C.F. Murphy and Associates, Inc., is an architectural firm. Defendant J.E. Dunn Construction Co. is a construction firm. Defendant Kansas City Structural Steel Co. is engaged in the erection of steel beams and frames. Defendant Bethlehem Steel Corp. manufactures and fabricates steel products, including steel bolts. Individual defendants Campbell, Roenigk, Luellen, Quinlan, and Keith comprised the last board of directors of the Bob D. Campbell Corp. and continue to do business as consulting structural engineers. These defendants (referred to collectively as the non-city defendants) all participated in the design and construction of Kemper Arena.

Defendant city of Kansas City owns and operates the arena.

On June 4, 1979, the roof of the arena collapsed.

In Count I, the plaintiffs allege that the non-city defendants negligently designed and constructed Kemper Arena, and list thirteen specific failures of design and construction, including failure to design and construct the roof to withstand stress caused by normal weather conditions; failure to design and construct devices to drain water from the roof; failure to design, construct, inspect, and test adequate roof supports; failure to provide a warning system for stress build-up; failure to design and manufacture parts that could withstand normal and foreseeable pressures; and failure to warn that the parts provided were not capable of withstanding such pressures. The defects were said to be concealed so that a reasonable inspection by plaintiffs would not have revealed them. Plaintiffs assert that as a direct and proximate result of defendants' negligence, the arena was unusable from June 4, 1979, to February 20, 1980, preventing plaintiffs from staging performances and selling souvenirs, thereby damaging Ringling Brothers in the amount of $203,342.58 plus costs; damaging Ice Follies in the amount of $450,000.00 plus costs; and damaging Sells-Floto in the amount of $314,591.86 plus costs.

In Count II, plaintiffs allege that the negligence of the non-city defendants "rendered the structure essentially and imminently dangerous to plaintiffs, other users of the building and the general public," damaging plaintiffs in the same amounts sought in Count I.

In Count III, plaintiffs allege that each of the non-city defendants participated in the design and construction of Kemper Arena, and that at the time plaintiffs obtained the rights to use the arena, it "was in a defective condition unreasonably dangerous", damaging them in the amounts shown above.

In Count IV, plaintiffs allege that the non-city defendants knew that the plain-

tiffs as well as the general public would use the Kemper Arena for business and entertainment and impliedly warranted that the arena was designed and constructed so as to be free of defects in design, workmanship and material. As a result of a breach of that implied warranty, plaintiffs were damaged in the amounts shown above.

In Count V, plaintiffs allege that the non-city defendants negligently and recklessly misrepresented that the Kemper Arena was properly designed and constructed, that defendants knew or should have known that those representations were not true, that in reliance on them, plaintiffs obtained the rights to use Kemper Arena, and that as a direct and proximate result, the plaintiffs were damaged in the amounts shown above.

The remaining four counts relate solely to the defendant city of Kansas City. In Count VI, plaintiffs assert that they entered into an agreement with the city for the use of Kemper Arena, that the city refused to make the arena available, and that as a result of that breach, plaintiffs were damaged in the amounts shown above.

In Count VII, plaintiffs assert that in reliance on the contract with the city, they scheduled performances in Kansas City and "materially altered their position". As a "direct, proximate and foreseeable" result of the city's refusal to be bound by the lease, plaintiffs were damaged in the amount of $967,934.44 plus costs.

In Count VIII, plaintiffs assert that the defendant city "negligently maintained and operated Kemper Arena in that its roof and supporting structure were dangerous and defective as fully described" in Count I. Further, the city was negligent by "wrongfully representing and certifying that Kemper Arena was free from defects . . . where defendant knew or should have known . . . that Kemper Arena was in a dangerous and defective condition" and that the arena was in violation of city ordinances pertaining to the maintenance of foundations, walls and roofs. As a result of the city's negligence,

plaintiffs were damaged in the amounts shown in Count I.

In Count IX, the plaintiffs again assert that the city negligently maintained and operated Kemper Arena and that the defects listed in Count I "rendered Kemper Arena essentially and imminently dangerous to plaintiffs, other users thereof and the general public." As a result of this negligence, plaintiffs were damaged in the amounts shown in Count I.

Following the filing of the petition, the non-city defendants filed motions to dismiss Counts I through V. On February 24, 1981, the trial court sustained those motions for failure to state a claim on which relief can be granted. On March 2, 1981, plaintiffs requested that the court designate its order as final for purposes of appeal. On July 9, 1981, the court ruled on that motion, denying the request. On July 17, 1981, plaintiffs filed a notice of appeal from both the February 24 and the July 9 order. On August 26, 1981, the court designated the order of February 24, 1981, as final. On September 2, 1981, plaintiffs again filed a notice of appeal from the February 24 order dismissing Counts I through V. (That appeal was consolidated with the earlier appeal on September 9, 1981.)

On October 8, 1981, the non-city defendants jointly filed a motion to dismiss plaintiffs' appeal, arguing that the appeal was not timely. Although the motion was overruled, this court granted permission to the parties to brief the issues, and they have done so. Accordingly, we reach this issue before considering the substance of plaintiffs' appeal.

### Timeliness of Appeal

■ Section 512.020[1] governs the right to appeal and provides that an appeal may generally be made only from a final judgment. To be final and appealable, a judgment must dispose of all parties and all issues in the case, leaving nothing for future determination, unless the trial court

1. All sectional references are to Revised Statutes of Missouri, 1978, unless otherwise indicated. The "Rules" referred to are the Missouri Rules of Civil Procedure.

has ordered a separate trial of any claim or issue or has specifically designated the particular judgment as a final judgment for purposes of appeal. *State ex rel. Schweitzer v. Greene,* 438 S.W.2d 229 (Mo.1969) (en banc); *Dalton v. Borger,* 562 S.W.2d 802 (Mo.App.1978). *See also Bolin v. Farmers Alliance Mut. Ins. Co.,* 549 S.W.2d 886 (Mo. 1977) (en banc) (holding that a summary judgment in favor of a defendant insurance company was interlocutory because it did not dispose of plaintiff's rights against an individual defendant), and *Spires v. Edgar,* 513 S.W.2d 372 (Mo.1974) (en banc) (discussing the decisions on this point in depth and concluding that an order sustaining one defendant's motion to dismiss plaintiff's claim was final because so designated by the trial court even though other defendants and issues remained).

Rule 81.06 governs the requirement of designation of a judgment as final, and provides in part as follows:

> When a separate trial is had before the court without a jury[2] of claims arising out of the *same transactions, occurrences or subject matter* as the other claims stated or joined in the case *the judgment entered shall not be deemed a final judgment* for purposes of appeal . . . *unless specifically so designated* by the court in the judgment entered. However, when a separate trial is had before the court without a jury of an *entirely separate and independent claim* unrelated to any other claims stated or joined in the case, then *the judgment entered shall be deemed a final judgment* for purposes of appeal . . . *unless the court orders it entered as an interlocutory judgment* . . . . (Emphasis added.)

 When claims arise out of the same transaction or occurrences, then, a non-jury judgment entered on only some of those claims *is not final,* unless so designated. When the claims are entirely separate and independent, the judgment entered *is final,* unless designated as interlocutory. *See State ex rel. Axtell v. Marsh,* 624 S.W.2d 874 (Mo.App.1981); *Schumacher v. Sheahan Inv. Co.,* 424 S.W.2d 84, 86 (Mo.App.1968). Here, then, where the trial court did not designate its order of February 24, 1981, as final until six months after the order was entered, we must determine whether the claims on which that order was based (Counts I through V) were entirely separate, independent, and unrelated to the undisposed of claims (Counts VI through IX), making that order *final without designation* thirty days after its entry as provided in Rule 81.05 (March 26, 1981), and requiring appeal within ten days of that date as provided in Rule 81.04(a) (April 6, 1981). If so, plaintiffs' appeal is too late. By contrast, if the claims arose out of the same transactions or occurrences, the order of February 24, 1981, was *not final* until it was so designated on August 26, 1981, making plaintiffs' appeal on September 2, 1981, timely as within the ten days provided in Rule 81.-04(a).

Here, all of plaintiffs' claims arise out of the collapse of the roof of the Kemper Arena and to that degree, obviously arise out of the same occurrence. Defendants argue, nevertheless, first, that the first five counts are severable because they are tortious in nature and concern a distinct group of defendants not named in the remaining four counts, all of which are contractual in nature.[3] Defendants characterize Counts VI through IX as a "separate, unconnected, contractual dispute with another defendant that was totally unrelated" to the tort claims brought against them in Counts I through V. However convenient such a characterization might be, we cannot accept it here where an examination of two of the

---

**2.** Note that the dismissal of a petition for failure to state a claim on which relief can be granted is equivalent to a "separate trial before the court without a jury within the meaning of Rule 81.06." *State ex rel. Ashcroft v. Gibbar,* 575 S.W.2d 924, 927 (Mo.App.1978).

**3.** Defendants cite *State* ex rel. *Cozean v. Meyer,* 449 S.W.2d 377, 380 (Mo.App.1969), in support of the contention that "the Court must avoid joinder of contractual matters with matters sounding in tort." *Cozean* was specifically overruled on that point in *State* ex rel. *Farmers Ins. Co. v. Murphy,* 518 S.W.2d 655 (Mo.1975) (en banc).

counts against the city, Counts VIII and IX, reveals that they are not contractual in nature, but instead, sound in tort, alleging that, as evidenced by the very defects listed in Count I, the city negligently maintained and operated Kemper Arena in violation of city ordinances and wrongfully misrepresented that the arena was free of defects. Accordingly, proof of the averments in Counts VIII and IX depends at least in part on whether the defects listed in Count I did in fact exist and cause the collapse of the roof. Moreover, the city's role as a party to a contract is not the basis for recovery in these counts (as it is in Counts VI and VII). Instead, its role is as a tortfeasor whose negligence interfered with plaintiffs' leasehold estate, the same role played by the non-city defendants in Counts I through V.

Defendants argue as well that in addition to the criteria for finality of separate judgments enumerated in Rule 81.06, the Eastern District case of *Crenshaw v. Great Central Ins. Co.*, 527 S.W.2d 1 (Mo.App.1975), has added the element of dependency. There, in Count I of their petition, Mr. and Mrs. Crenshaw sought recovery for the wrongful death of their son, killed in an automobile accident. In Count II, the boy's sister, Gretchen, sought recovery for her personal injuries resulting from the same accident, and in Count III, the father sought recovery for Gretchen's medical expenses. The trial court dismissed Count I as being barred by the statute of limitations, and plaintiffs appealed. The appellate court held that although all three counts arose from the same accident, all three affected members of the same family, and all three presented common questions of law and fact, including negligence and causation, "Rule 81.06, however, does not speak to these kinds of similarities. The rule speaks to a situation where the several claims, counts, etc. are *dependent* on each other." (Court's emphasis.) Count I was deemed not to be dependent on the remaining counts because it was separate and apart from any relief that might be given on those counts and was, therefore, held to be final and appealable.

We interpret *Crenshaw* to clarify the "entirely separate and independent claim" language of Rule 81.06 to mean that claims dependent in some respect on the outcome of the causes of action remaining on other counts cannot be independent. *See also State* ex rel. *Ashcroft v. Gibbar,* 575 S.W.2d 924, 927 (Mo.App.1978). We would agree that, as in *Crenshaw* where one count has been dismissed on a statute of limitations basis, dismissal can have no effect whatsoever on other counts against the same defendant with different statutes of limitations. Where, as here, however, certain counts are dismissed for failure to state a cause of action, and remaining counts raise clearly related issues, the dismissal cannot be said to be without effect on the remaining counts. In this situation at least, the counts remain dependent on each other and hence, not final unless so designated.

This is distinguishable from *Hauser v. Hill,* 510 S.W.2d 765 (Mo.App.1974), also cited by defendants, which held that Count I, a declaratory judgment determining which of defendant's insurance companies provided coverage for plaintiff's injuries, was final and appealable even though it arose from the same occurrence (an automobile accident) on which the other counts were based. The court held that because the first count did not involve the liability of the defendant tortfeasor, the issues in that count were "entirely different from those in the remaining counts and the determination of Count I has no effect upon the determination of the other counts ...." The same cannot be said here. The issues, as we have seen, are not entirely different and in fact, common questions of fact and law abound. We are dealing directly in each of Counts I, II, III, IV, V, VIII and IX with the question of what party, if any, should be held liable for the defects, if any, which caused the collapse of the roof and the injury to plaintiffs' leasehold. Obviously, viewed in this light, the dismissal of Counts I through V for failure to state a cause of action does affect determination of Counts VIII and IX which are based on related theories. The counts can-

not, by any stretch of the imagination, be said to be independent. We need not decide whether, if the remaining counts consisted only of the contractual claims in Counts VI and VII, the "tried" and "untried" claims would be sufficiently dependent to be final without designation. The existence of any undetermined, dependent claim precludes such finality.

Accordingly, we hold that Counts I through V are not entirely separate and independent from the petition's remaining counts, and therefore, under the dictates of Rule 81.06, the order dismissing those counts was not final and appealable until so designated by the trial court on August 26, 1981. Plaintiffs' appeal on September 2, 1981, was, therefore, timely.

We now proceed to the merits of this appeal.

### Counts I and II—Negligence

■ Plaintiffs allege that the trial court erred in dismissing Counts I and II for negligence because they properly pleaded the elements of actionable negligence as presented in *Scheibel v. Hillis,* 531 S.W.2d 285, 288 (Mo.1976) (en banc): (1) the existence of a duty; (2) breach of that duty; and (3) injury resulting from that breach.

None of the parties seriously disputes that plaintiffs have pleaded both breach and injury. At issue is whether as the designers, supervisors, contractors, sub-contractors, and manufacturers of the elements used in the roof supports, the non-city defendants were under any duty to third parties to exercise due care. We hold that they were.

As to architects and contractors, the court in *Aetna Ins. Co. v. Hellmuth, Obata & Kassabaum, Inc.,* 392 F.2d 472 (8th Cir. 1968), stated at 476–77 that

> [a]n architect is not a guarantor or an insurer but as a member of a learned and skilled profession he is under a duty to exercise the ordinary, reasonable technical skill, ability and competence that is required of an architect in a similar situation; and *if by reason of a failure to use due care under the circumstances, a fore-seeable injury results, liability accrues.* (Emphasis added.)

That language was based in part on the holding in *Westerhold v. Carroll,* 419 S.W.2d 73 (Mo.1967), in which the Supreme Court held an architect liable to a third party surety for negligent performance of his contractual duty to certify the amount of work performed by contractors. Quoting *Biakanja v. Irving,* 49 Cal.2d 647, 320 P.2d 16 (1958) (en banc), the court at 419 S.W.2d 81 listed the factors that must be balanced before holding a defendant liable to a third party with whom he is not in privity, including the following:

> the extent to which the transaction was intended to affect the plaintiff, *the fore-seeability of harm* to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to defendant's conduct, and the policy of preventing future harm. (Emphasis added.)

Emphasizing the foreseeability of damage to the surety resulting from the architect's negligence, the *Westerhold* court at 80 noted that in *"Lambert v. Jones,* 339 Mo. 677, 98 S.W.2d 752, 758, it was stated that where one under contract with another assumes responsibility for property or instrumentalities and agrees under his contract to do certain things . . . which, if left undone, would likely injure third persons, 'there seems to be no good reason why [he] should not be held liable to third persons injured thereby . . . .' "

Noting the two underlying policy reasons *not* to impose liability on defendants not in privity with third parties—(1) avoidance of unlimited liability to an unlimited number of persons and (2) avoidance of burdening those who contract with obligations they would not voluntarily assume—the court found an absence of those factors in *Westerhold* and imposed liability on the architect.

We consider as well the decision in *Begley v. Adaber Realty & Inv. Co.,* 358 S.W.2d

785 (Mo.1962), in which the court held the general contractor of a store building liable for personal injuries to a customer caused by ductwork falling from the ceiling long after the owner of the building had accepted the contractor's work. The court at 791 held that situation to be

> an exception to the general rule of nonliability after acceptance of the work for injuries to third persons with whom the contractor is not in a contractual relation. [*See Gruhalla v. George Moeller Constr. Co.,* 391 S.W.2d 585 (Mo.App.1965), for the general rule.] This exception applies where the structure was so defectively constructed as to be essentially and imminently dangerous to the safety of others; the defects are so hidden and concealed that a reasonably careful inspection would not have disclosed them, and these things are known to the defendants but not to those who accepted them.

■ Considering the *Begley* and the *Westerhold* opinions together, we find that architects and contractors owe a duty to exercise the care required of their professions to persons with whom they are not in privity when the injury to those third parties is foreseeable. This is true even when their work has already been accepted by the structure's owner, when the specific conditions enumerated in *Begley* and specifically alleged in plaintiffs' Counts I and II are present.[4] Injury—both personal and property—to parties presenting entertainment in Kemper Arena was or should have been foreseeable by these defendants as a likely result of negligent performance of their duty to design and build a safe structure in which entertainment may be presented.

Accordingly, the architects and contractors here owed a duty of care to these plaintiffs.

Of course, one of the non-city defendants in this case is clearly neither an architect nor a contractor. Defendant Bethlehem Steel Corp. is alleged only to have been the manufacturer of the bolts used in the roof's support.

■ Plaintiffs have alleged that defendants failed to design, manufacture, install, inspect, and test parts used in the roof's supports so as to withstand normal and foreseeable pressures, and also to warn of the inadequacy of the parts. Plaintiffs have not informed us which, if any, of these obligations other than "manufacture" are alleged to be Bethlehem Steel's.

■ Nevertheless, on that allegation alone, we cannot seriously doubt the existence of a duty by Bethlehem Steel to manufacture its product so as to be free of dangerous defects. Under our products liability law, Missouri now imposes a duty not to market a product which is unreasonably dangerous as manufactured. *See Blevins v. Cushman Motors,* 551 S.W.2d 602, 607 (Mo. 1977) (en banc) and *Keener v. Dayton Elec. Mfg. Co.,* 445 S.W.2d 362 (Mo.1969). On proof of an unreasonably dangerous product (and certain other elements not relevant here), strict liability is imposed, without proof of fault. That being so, a fortiori the same duty exists when a plaintiff chooses to take on the burden of proceeding against a manufacturer under a negligence theory rather than strict liability.[5]

Plaintiffs, then, must present proof that defendant Bethlehem Steel negligently manufactured bolts so as to be unreasonably dangerous when used for the intended

---

**4.** This is not the only exception to the "acceptance rule." For a discussion of other exceptions not applicable here, *see* Dement, *Products Liability: Construction Contractors and Architects,* 22 J.Mo.Bar 59, 61–64 (1966).

**5.** Even under traditional negligence, Missouri has recognized the duty of a manufacturer to exercise reasonable care in the manufacture of chattel which involves an unreasonable risk of substantial bodily harm both to those using it for the intended purpose and to those expected to be in the vicinity. This principle applies as well where the manufacturer's negligence renders unreasonably dangerous a product into which its part is incorporated. *Willey v. Fyrogas Co.,* 363 Mo. 406, 251 S.W.2d 635, 640 (1952). *See also McLeod v. Linde Air Products Co.,* 318 Mo. 397, 1 S.W.2d 122, 126 (1927), recognizing that liability is not limited to products inherently dangerous, but extends as well to a product "which when applied to its intended use becomes dangerous."

purpose of supporting the arena roof. This is not a light burden, but plaintiffs must be permitted to present what evidence they can.

Finally, plaintiffs' petition does not make Kansas City Structural Steel's role entirely clear. This defendant is said only to have been "responsible for a portion of the construction of Kemper Arena and as such it supervised and participated in erection of the structural steel elements supporting the building . . . ." From this allegation, Kansas City Structural Steel may have been merely a sub-contractor erecting steel beams or it may have actually provided the beams and welded them into place. For purposes of this negligence cause of action, the distinction is not important. As we have held, the defendant owes a duty of care under these circumstances in either role. (The distinction becomes critical, however, in our discussion of products liability, *infra*.)

Having decided that all of the non-city defendants had a duty to perform their obligations without negligence, we consider next the type of injury for which they may be held liable.

Defendants argue that the *Begley* exception to the non-liability after acceptance rule is limited to personal injury. We disagree. True, the facts in *Begley* involved bodily harm and, therefore, the holding in that case is only that for such injury liability may attach. But the language we have quoted from the opinion, *supra,* is not confined to personal injury but to "injuries to third persons." Moreover, we find no logical basis on which recovery can be limited according to an arbitrary division between property damage and personal injury. Liability must be premised instead on whether the injury to plaintiffs was foreseeable and within the policy considerations of avoiding both unlimited liability and the overburdening of those who assume contractual responsibilities, crucial to the holding in *Westerhold.*

The answer to that question turns on the nature of plaintiffs' injury. Defendants characterize it as a mere loss of a business expectation at best, or alternatively a loss of a void oral contract. If so, extending liability would no doubt expose defendants to almost unlimited liability to all businesses damaged in any collateral manner by the collapse of the arena's roof, and would surely overburden defendants with obligations they never intended and cannot be expected to assume.

Plaintiffs, however, characterize their injury as a loss of rights to which they were entitled by a lease, a recognized property interest. If that were so, their loss would not only be far more foreseeable by defendants, who were alleged to have been aware that the arena would be used for entertainment purposes, but extending liability would not expose defendants to unlimited liability to all establishments which may have suffered some loss of business as a result of the collapse of the roof. Moreover, although defendants correctly draw our attention to *J. Louis Crum Corp. v. Alfred Lindgren, Inc.,* 564 S.W.2d 544 (Mo. App.1978), and *Frank Horton & Co., Inc. v. Diggs,* 544 S.W.2d 313 (Mo.App.1976), in which this court has refused to acknowledge a cause of action in Missouri for negligent interference with a contractual interest, Missouri has long recognized that negligence which deprives a tenant of his right to use and enjoy a leasehold is actionable. *See Shaw v. Greathouse,* 296 S.W.2d 151, (Mo.App.1956), in which Judge Cave of this court wrote,

> It is well settled that a landlord and tenant have separate estates for injuries to which, by third parties, each has a right of action, and where a wrongful act injures the interest of both, each has a right of action for the injuries to his own interest and each may maintain a separate action.

*See also Brouster v. Shell Pipe Line Corp.,* 16 S.W.2d 672, 674 (Mo.App.1929) (recognizing that separate from the right of a landlord to recover for permanent injury to property, "the tenant, who has merely a possessory right, may recover for the injury to his use and enjoyment," in that case, the destruction of his growing crops); *Ridge v.*

*Railroad Transfer Co.,* 56 Mo.App. 133, 138–39 (1894) (suggesting that for wrong committed by a negligent third party against possession of a leasehold, the tenant would be the proper party to sue); and *McKee v. The St. Louis, Keokuk & Northwestern R.R. Co.,* 49 Mo.App. 174, 179–80 (1892) (stating that where property is under lease, the owner may sue for injuries to the freehold, and the tenant for injuries to possession).

Plaintiffs' case differs from the cases cited above only in that while those cases acknowledge the right of tenants *presently in possession* to recover for the negligence of third parties which damages their right to possession, plaintiffs here had not yet taken possession at the time of the roof collapse. We find this difference of no significance and agree with the Restatement (Second) of Property sec. 5.2 comment g (1977), which addresses the rights of tenants where the premises are rendered unsuitable after the date of the lease but before entry. It provides as follows:

> g. Changed condition caused by third party. A third party may damage the leased property, particularly the buildings thereon, thereby rendering the premises unsuitable for the use contemplated by the parties.... [U]nless the landlord, before the date that the tenant is entitled to possession, restores the leased property to a suitable condition, the tenant is entitled to terminate the lease .... *If the tenant terminates the lease* when he is entitled to do so, though he cannot recover damages from the landlord because the changed condition was not the fault of the landlord, *the tenant may be entitled to recover damages from the third person. Similarly, if the tenant does not elect to terminate his lease, the third person may be liable to him for damages.* (Emphasis added.)

We find, therefore, that plaintiffs may be entitled to recover as tenants whose leasehold interest has been damaged by third parties prior to the entry. The premise, of course, is the existence of a valid lease.[6]

In their petition, plaintiffs alleged that they entered into an "agreement" with the city by which they "obtained the exclusive right to use, possess, and occupy Kemper Arena for definite periods, after which time the exclusive right to use and control the Arena would revert to the City of Kansas City, Missouri." Plaintiffs did not specifically use the words "lease" or "written," and thus, say defendants, they had a void oral contract.

Defendants rely on sec. 432.070 which requires that all leases with cities be in writing. They cite *Neal v. Junior College Dist. of E. Cent. Missouri,* 550 S.W.2d 580, 582 (Mo.App.1977), which held that in such cases a plaintiff must both allege and prove a written contract.

Rule 55.22 provides that a written contract may be pleaded in one of three ways: (1) according to legal effect; (2) by reciting it at length; or (3) by attaching a copy. Plaintiffs have done neither of the latter two, so we must determine whether a written lease has been pleaded in legal effect.

The essentials of a landlord-tenant relationship are: (1) reversion in the landlord; (2) creation of an estate in the tenant either at will or for a term less than that which the landlord holds; (3) transfer of exclusive possession and control of the tenant; and (4) a contract. *Friend v. GEM International, Inc.,* 476 S.W.2d 134, 137–38 (Mo.App.1971).

Plaintiffs have specifically pleaded elements one, three, and four. Defendants point out that the creation of an estate in land was not alleged. True, the

---

**6.** Defendants draw our attention to *McKinley v. The Chicago, Sante Fe and California Ry. Co.,* 40 Mo.App. 449 (1890), in which this court stated at 456 that prior to taking possession under a verbal lease, a tenant has no estate in lands. This ancient position is contrary to the modern Restatement position, *supra.* More-

over, we find that statement not decisive in this case because of its specific limitation to *verbal* leases. See our discussion below, in which plaintiffs must be given the opportunity to prove the existence of a valid (and in this case, *written* ) lease.

word "estate" does not appear in the petition, but "estate" in the leasehold context requires simply a conveyance of a lessor's interest in real property for a limited term. *See State* ex rel. *St. Louis County v. Evans,* 346 Mo. 209, 139 S.W.2d 967 (1940) (en banc). Plaintiffs in pleading the exclusive right to use, possess and occupy the arena "for definite periods" have in effect pleaded an estate. Although plaintiffs' choice of language may not be a model of clarity, it sufficiently pleads the legal effect of a written lease. Plaintiffs must be permitted the opportunity to prove the existence of such a lease, if they can.

 Plaintiffs may indeed have difficulty proving that their agreement with the city is a lease rather than a mere license. The two are often difficult to distinguish. Plaintiffs must prove that the agreement gave them exclusive possession of the premises, or a portion thereof, as against the world, including the city, in order to establish the existence of a lease. If plaintiff fails in this proof and shows only that the agreement conferred a non-exclusive privilege to use or occupy the premises, then the agreement will be deemed a license. *Gerould Co. v. Arnold Constable & Co.,* 65 F.2d 444 (1st Cir.1933); *McKennon v. Anderson,* 49 Wash.2d 55, 298 P.2d 492 (1956). *See also Hancock v. Bradshaw,* 350 S.W.2d 955 (Tex.Civ.App.1961). Because the plaintiffs have pleaded the *exclusive* right to possess the arena, they must be afforded the opportunity to prove the existence of a valid lease. *See* Rule 55.22.

The factors pleaded and reasonable inferences to be drawn from the allegations, when viewed in the light most favorable to the plaintiffs, demonstrate grounds for relief based on the existence of a lease, and thus dismissal is inappropriate. *DeMaranville v. Fee Fee Trunk Sewer, Inc.,* 573 S.W.2d 674, 676 (Mo.App.1978). Rather than dismissing plaintiff's claim because of imperfectly or defectively stated pleadings, defendant may "move for a more definite statement of any matter contained in a pleading which is not averred with sufficient particularity to enable him to prepare his responsive pleadings or to prepare generally for trial when a responsive pleading is not required." Rule 55.27(d). Finally, plaintiffs may wish to amend their petition to include more specific allegations of the existence of their lease with the city. Rule 67.06.

We hold, therefore, that plaintiffs' Counts I and II state a cause of action for negligent interference with a tenant's right to use and enjoy a leasehold, but that because the alleged interference occurred long after the non-city defendants' work was accepted by the structure's owner, liability may only attach if plaintiffs can prove that the "essentially and imminently dangerous" exception enunciated in *Begley* is applicable. Should plaintiffs be able to prove their cause of action, they would be entitled to their prospective profits, limited by the general rule that such profits are recoverable only when proved to be reasonably certain but for defendant's tortious conduct and when ascertainable and measurable with reasonable certainty. *Riddle v. Dean Machinery Co.,* 564 S.W.2d 238, 257 (Mo.App. 1978).

### *Count III—Products Liability*

 In Count III, plaintiffs pleaded the recognized elements of products liability: (1) that the defendants designed or manufactured Kemper Arena, the allegedly defective product; (2) that the arena was in a defective condition unreasonably dangerous for any reasonably anticipated use; (3) that the arena was used in a manner reasonably anticipated; and (4) that plaintiffs were damaged as a result of the defect. *See Blevins v. Cushman Motors, Inc., supra,* and *Keener v. Dayton Elec. Mfg. Co., supra.*

Products liability law stems primarily from the Restatement (Second) of Torts Sec. 402A (1965) which holds strictly liable the seller of any product in a defective condition unreasonably dangerous to the user or to his property. The policy behind products liability has been expressed many times, beginning with the seminal case of *Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 27 Cal.Rptr. 697, 701, 377 P.2d

897, 901 (1962) (en banc), which stated that "[t]he purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves."

Further, strict liability has been said to have originated

> primarily as a means of facilitating the legitimate interests of the consuming public and bringing common-law remedies into step with the practicalities of modern industrialism. The outmoded requirement of contractual privity, coupled with manufacturers' sweeping disclaimers of liability, frequently operated to deny effective remedies to those who purchased commercial products at the bottom of a multi-tiered production and distribution network.

*City of Mounds View v. Walijarvi,* 263 N.W.2d 420, 425 (Minn.1978).

The primary question here is whether these policy considerations warrant the extension of strict liability to architects, contractors, and suppliers of component parts for commercial buildings.

Defendants correctly point out that sec. 402A, comment d, includes a non-exclusive list of the type of products covered by the section. Notable for their absence are buildings and other structures, which are addressed separately in the Restatement of Torts Sections 353, 385 and 389. We would agree that in all likelihood, the drafters of the Restatement did not intend to include real property within the language of sec. 402A.

The intention of the drafters is not, however, the final word. Jurisdictions which have considered the question have consistently held that newly constructed homes fall within the meaning of "product" in products liability law. *See,* for example, *Berman v. Watergate West, Inc.,* 391 A.2d 1351, 1357 (D.C.1978); *Schipper v. Levitt & Sons, Inc.,* 44 N.J. 70, 207 A.2d 314, 325

(1965); and *Kriegler v. Eichler Homes, Inc.,* 269 Cal.App.2d 224, 74 Cal.Rptr. 749, 752 (1969). The courts have based this extension of sec. 402A liability to real property on the policy consideration that the "buyer of a home from a builder can no more dig up the ground to inspect the [defect] than the buyer of an automobile can cause the car to be disassembled and tested." *Patitucci v. Drelich,* 153 N.J.Super. 177, 379 A.2d 297, 298 (1977).

In Missouri, these same considerations were expressed in *Smith v. Old Warson Dev. Co.,* 479 S.W.2d 795, 799 (Mo.1972) (en banc), in which the court applied the sec. 402A principles to the purchase of "a manufactured product—the house." [7]

In other words, the applicability of strict liability depends not on an arbitrary line of division between chattel and real property, but on a consideration of whether the policy behind such liability is applicable to the facts.

Courts which have considered whether strict liability should extend to the architects of commercial buildings have held it should not, primarily because the policy considerations are not applicable. In *State ex rel. Risk Management Div. of Dep't of Fin. and Admin. v. Gathman-Matotan Architects & Planners, Inc.,* 98 N.M. 790, 653 P.2d 166, 170 (N.M.Ct.App.1982), the court held that an architect would not be held to a higher standard than that imposed by traditional negligence principles, and observed that among

> the reasons for the development of . . . strict liability in tort . . . [were] the lack of privity between the manufacturer and the buyer, the difficulty of proving negligence against a distant manufacturer using mass production techniques, and the better ability of the mass manufacturer to spread the economic risks among its consumers. . . . These considerations are not applicable in a contract for professional services.

---

**7.** We are aware that although the court in *Old Warson* was applying the sec. 402A principles adopted in Missouri in *Keener v. Dayton Elec.*

*Mfg. Co., supra,* it was using those principles to recognize a cause of action for *implied warranty* in the purchase of a new house.

Similarly, in *City of Mounds View v. Walijarvi, supra,* the Minnesota Supreme Court considered an architect's liability for a leaky addition to city hall and held that negligence was the sole cause of action available to the city. Labeling architecture an "inexact science" which must "provide for random factors which are incapable of precise measurement" and taking into consideration the consumer-related origins of strict liability, the court reasoned at 425 that

> [t]he relationship between architect and client is markedly different [from that of consumer and mass producer]. For a client, architectural services are hardly produced by a faceless business entity, insulated by a network of distributors, wholesalers, and retailers. Architects and clients normally enjoy a one-to-one relationship and communicate fairly extensively during the course of the relationship. When a legal dispute arises, the client has no trouble locating the source of his problem . . . .

> Finally, while it is undoubtedly fair to impose strict liability on manufacturers who have ample opportunity to test their products for defects before marketing them, the same cannot be said of architects. Normally, an architect has but a single chance to create a design for a client which will produce a defect-free structure. Accordingly, we do not think it is just that architects should be forced to bear the same burden of liability for their products as that which has been imposed on manufacturers generally.

See also *Abdul-Warith v. Arthur G. McKee and Company,* 488 F.Supp. 306 (E.D. Pa.1980), aff'd. mem., 642 F.2d 440 (3rd Cir.1981), in which the court noted at 310–11 n. 3 that while strict liability may be applicable to a defendant who has both designed and constructed a skip bridge,[8] cases dealing with the strict liability of design professionals generally rely upon the services exception to sec. 402A. Consequently, where the architect or engineer simply provides the design or merely supervises, without actually participating in the construction of the challenged product, he has not been held strictly liable; where, however, the professional actually assembles or erects the allegedly defective item, strict liability will attach.

Examining the cases cited by the *Abdul-Warith* court for its statement that a professional who actually assembles a defective item may be held strictly liable, we note that none imposes such liability on a builder other than a residential house builder.[9] One case which does impose such liability, however, is *Hodgson v. Chin,* 168 N.J.Super. 549, 403 A.2d 942 (1979), in which the builder-vendor of a building consisting of two small stores and two apartments was held impliedly to warrant the fitness of the building for its intended use. (Note that apparently, in New Jersey, implied warranty is equivalent to strict liability.) Nevertheless, that holding was premised on the fact that part of the property did, indeed, contain residences, and that the buyers were small business persons relying on the building's fitness. Although expressing no opinion as to whether buyers of large commercial buildings not erected pursuant to written building contracts were entitled to the protections of its holding, the court remarked at 403 A.2d 945 n. 2, that "[d]ifferent principles (breach of contract) would undoubtedly continue to apply where an owner procures the construction of a building pursuant to a building contract and there are construction defects."

■ We agree. The underlying consumer protection principles of strict liability simply do not appear to be applicable to the constructors of a large commercial building built for a particular client presumably under contract with that client. Contract and negligence remedies in such circumstances

---

**8.** A component of the blast furnace unit used in the production of steel.

**9.** *See LaRossa v. Scientific Design Co.,* 402 F.2d 937 (3rd Cir.1968); *Stuart v. Crestview Mut. Water Co.,* 34 Cal.App.3d 802, 110 Cal. Rptr. 543 (1973); *Castaldo v. Pittsburg-Des Moines Steel Co.,* 376 A.2d 88 (Del.1977); *City of Mounds View v. Walijarvi, supra.*

are well established. Where the client could not assert a strict liability cause of action against his builder, we see no justification for holding that the client's tenant may do so. See *Milau Assoc., Inc. v. North Ave. Dev. Corp.*, 42 N.Y.2d 482, 398 N.Y. S.2d 882, 368 N.E.2d 1247 (N.Y.1977), precluding a commercial tenant's claim that a general contractor should be held strictly liable for non-negligent performance.

■■■ We hold, therefore, that as to defendants C.F. Murphy & Associates as the architect and construction supervisor, J.E. Dunn Construction Co. as the general contractor, and individual defendants Campbell, Roenigk, Luellen, Quinlan, and Keith as consulting structural engineers, plaintiffs have no cause of action for products liability.

■■■ Two of the named defendants here, however, do not clearly fall into the architect or contractor classification. Plaintiffs' petition alleges that the defendant Bethlehem Steel provided the steel bolts to secure the roof's supports. As discussed *supra,* Kansas City Structural Steel's role is not entirely clear, but the petition implies that that defendant actually provided the steel beams and welded them into place. If that is so, we have no difficulty finding that those beams, if defective, may have been products within the meaning of sec. 402A. The same is true of bolts provided by Bethlehem Steel. For cases so holding, see *Ernest W. Hahn, Inc. v. Armco Steel Co.,* 601 P.2d 152 (Utah 1979) (holding strictly liable the defendant which manufactured the steel joists incorporated into the structural supports of a shopping center roof which collapsed), and *Hawkins v. Larrance Tank Corp.,* 555 P.2d 91 (Okl.App.1976) (holding strictly liable defendant which manufac-

tured a fire escape and furnished bolts which proved inadequate to secure the escape to the exterior wall).

We hold, therefore, that plaintiff must be permitted the opportunity to discover and present evidence as to Kansas City Structural Steel's role in the "erection" of the steel beams and that if that role included providing the beams themselves, an action based upon strict liability will lie against Structural Steel. As for Bethlehem Steel Corp., what we have already held demonstrates defendant's potential exposure under principles of strict liability.

■■■ Regarding damages, three kinds—personal injury, damage to property other than the property sold, and damage to the property sold when rendered useless by a violent occurrence—have been held recoverable under a strict liability theory. *Crowder v. Vandendeale,* 564 S.W.2d 879, 881 (Mo.1978) (en banc). As we held in our discussion of plaintiffs' negligence counts, plaintiffs here have alleged damage to a recognized property interest other than the property sold—a leasehold. Plaintiffs are entitled to recover the proved value of that property interest, including lost profits.[10]

### Count IV—Implied Warranty

In their fourth count, plaintiffs pleaded implied warranty, alleging that defendants "did impliedly warrant that the Arena was designed and constructed in a skillful and workmanlike manner and was free of defects in design, workmanship and material," when in fact it was not fit for use.

Plaintiffs rely on *Smith v. Old Warson Dev. Co., supra,* 479 S.W.2d at 798, which recognized an implied warranty of habita-

---

10. *Hales v. Green Colonial, Inc.,* 490 F.2d 1015 (8th Cir.1974), cited by defendants as support for their position that economic loss is not recoverable in Missouri absent physical harm, provides no support in this case. Here, as in *Hales,* plaintiffs have alleged a loss of profits resulting from damage to property. In *Hales,* that property was plaintiff's building. Here, that property is plaintiffs' alleged leasehold interest. Just as in *Hales,* plaintiffs here are entitled to their loss of profits, if they can

prove them with reasonable certainty. *See also Ernest W. Hahn, Inc. v. Armco Steel Co., supra,* at 159–61, in which the court approved a jury instruction entitling the owner of a shopping center to all damages caused by defendant's defective product (steel supports for the roof of the center which collapsed when overburdened with snow), including plaintiff's lost income and damages incurred by plaintiff's tenants.

bility extending from a builder-vendor to the purchaser of a new house.

That opinion referred to sec. 402A and cited *Keener v. Dayton Elec. Mfg. Co., supra,* 445 S.W.2d at 364, for the rule that the difference between strict liability and implied warranty in Missouri would not be one of substance since our courts are clearly recognizing the tort nature of the liability imposed. Although those cases strongly suggested that implied warranty was tortious in nature, the court in *Crowder v. Vandendeale, supra,* held otherwise. There, at 881 the court held that "the theoretical underpinnings of the implied warranty recognized in *Old Warson*" are of a "contractual nature," predicated as that decision was on a purchase (suggesting contract) rather than the conduct of the builder (suggesting tort). Because the warranty is implied by virtue of the sale to the first purchaser, the court limited the implied warranty cause of action to that first purchaser.

Here, plaintiffs have not alleged that they are in privity with any of the defendants.

Moreover, to find a cause of action here we would necessarily have to extend the implied warranty doctrine now recognized in Missouri for newly constructed homes to large commercial buildings. We discern little willingness in other jurisdictions to make that extension. *See,* for example, *Hodgson v. Chin, supra,* extending the doctrine of implied warranty to part residential, part commercial buildings, but, as discussed above, impliedly disapproving extension to large commercial buildings constructed pursuant to contract; *State ex rel. Risk Management Div. of Dep't of Fin. and Admin. v. Gathman-Matotan Architects and Planners, Inc., supra; Milau Assoc., Inc. v. North Ave. Dev. Corp., supra; Groover v. Magnavox Co.,* 71 F.R.D. 638 (D.C.Pa.1976) (recognizing implied warranty only for the construction of new houses); and *Stanford v. Owens,* 46 N.C.App. 388, 265 S.E.2d 617, 621 (1980) (recognizing that "to date this right of action exists only in the sale of a new residence to a consumer-vendee").

One line of cases, however, *has* extended the implied warranty of fitness to construction contracts. In *Robertson Lumber Co. v. Stephen Farmers Coop. Elevator Co.,* 274 Minn. 17, 143 N.W.2d 622, 626 (1966), a lumber company was held impliedly to warrant its work in building a grain storage building for a farmers' cooperative. Such liability was limited to cases where the contractor had held himself out as competent, the owner had no expertise in the work, the owner furnished no plans or specifications, and the owner indicated his reliance on the builder. Similar holdings appear in *Markman v. Hoefer,* 252 Iowa 118, 106 N.W.2d 59, 62 (1960), and *Air Heaters, Inc. v. Johnson Elec., Inc.,* 258 N.W.2d 649 (N.D.1977).

█ Even if we were to embrace this minority position as the law in Missouri, we note that those decisions recognize only a cause of action between plaintiffs who have contracted for building services and the builders with whom they contract, and then only when the owner is in a particular position of reliance on the builder's competence. To extend this implied warranty as well to *tenants* of commercial owners would eliminate concerns expressed in these decisions with the nature of the owner and his reliance, and would certainly run contrary to Missouri's requirement that implied warranty requires privity of contract. Although commercial tenants are arguably within the class of persons in need of protection from structural defects, so too, arguably, are second purchasers of homes damaged by latent defects not surfacing until after the first purchaser has resold. Such second purchasers have been specifically denied the protections of implied warranty in Missouri due to lack of privity. *Crowder v. Vandendeale, supra. See also John H. Armbruster & Co. v. Hayden Co.— Builder Developer, Inc.,* 622 S.W.2d 704, 705 (Mo.App.1981), recognizing that just as a second purchaser is not entitled to an implied warranty cause of action, neither is a first purchaser who has sold the house and hence, is no longer in privity with the builder.

We find, therefore, that even if we accepted the minority position that commercial owners are entitled to the protections of implied warranty, in this case lack of privity precludes such a cause of action.

### Count V—Negligent Misrepresentation

In Count V, plaintiffs alleged that defendants "negligently and recklessly misrepresented to plaintiffs, the general public and other users of Kemper Arena" that the design and construction was safe and fit for the intended use. Defendants "knew or should have known in the exercise of reasonable care that the facts of such misrepresentation were not true or were not known to be true," and made the misrepresentation "with the intent that they should be relied upon by the general public ... including plaintiffs ...." Acting in reliance on these misrepresentations, plaintiffs obtained the rights to the exclusive use of the arena and were damaged as a result.

Plaintiffs argue that this states a cause of action for negligent misrepresentation.

As Judge Welliver stated in his dissenting opinion in *Huttegger v. Davis,* 599 S.W.2d 506 (Mo.1980) (en banc), the Supreme Court of Missouri has never expressly recognized a cause of action for *negligent* misrepresentation. The majority opinion in that case specifically acknowledged that the plaintiffs there disclaimed *negligent* misrepresentation in a real estate transaction as their theory of recovery for false statements as to the availability of water hookups. They argued only an *intentional* theory. Judge Welliver urged the court to disregard plaintiffs' erroneous theory of liability and, rather than decline to consider the submissibility of a negligence theory, "acknowledge that a cause of action exists in this state for the recovery of pecuniary loss caused to persons who justifiably rely on information supplied for their guidance in a business transaction ...."

As Judge Welliver pointed out, such a cause of action was recognized by the Court of Appeals, Eastern District, in *Ligon Spe-* *cialized Hauler, Inc. v. Inland Container Corp.,* 581 S.W.2d 906 (Mo.App.1979),[11] (acknowledged by the majority in *Huttegger* at 512 n. 4). It is based on Restatement (Second) of Torts sec. 552 (1977) which provides as follows:

> 552. Information Negligently Supplied for the Guidance of Others
>
> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them, by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
>
> > (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
>
> (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

The elements of this cause of action are, then: (1) that defendant supplied information in the course of his business or because of some other pecuniary interest; (2) that because of a failure by defendant to exercise reasonable care or competence, the information was false; (3) that the information was intentionally provided by defendant for the guidance of a limited group, including plaintiffs, in a particular business transaction; and (4) that in relying on the

11. For a listing of other jurisdictions recognizing the negligent misrepresentation cause of action, *see Huttegger v. Davis, supra* at 515 n. 3 (Welliver, J., dissenting).

information, plaintiffs suffered a pecuniary loss.

Without specifically recognizing the viability of sec. 552, the Supreme Court has recognized the liability of an architect to a third party (surety) for negligently misstating to the building's owner the amount of work performed by contractors. *Westerhold v. Carroll, supra.*

The Court of Appeals, Eastern District, has recognized both that a shipper's erroneous representation of the weight of transported machinery may, when relied upon by the hauler to its detriment, support a negligent misrepresentation cause of action, *Ligon Specialized Hauler, Inc. v. Inland Container Corp., supra,* and that an accounting firm which prepares an inaccurate balance sheet knowing that a specific third party will rely on the representations contained therein to determine the price of stock, may be held liable under this theory. *Aluma Kraft Mfg. Co. v. Elmer Fox and Co.,* 493 S.W.2d 378 (Mo.App.1973). *See also Springdale Gardens, Inc. v. Countryland Dev., Inc.,* 638 S.W.2d 813 (Mo.App.1982), recognizing the cause of action but holding that real estate purchaser failed to make a submissible case.

We see no reason why this cause of action may not extend to misrepresentations concerning the fitness of a building when those misrepresentations are specifically made by a party intending that another rely on them in a business transaction. *See,* for example, *Neff v. Bud Lewis Co.,* 89 N.M. 145, 548 P.2d 107, 110 (1976), holding that a real estate broker who failed to disclose to a purchaser known defects in a building's heating and cooling system may be held liable *for negligent misrepresentation.*

Liability does not extend, however, to every person who ultimately may be aware of the misstatement. In the interest of the "important social policy of encouraging the flow of commercial information upon which the operation of the economy rests", the defendant must be "manifestly aware of the use to which the information was to be put and intended to supply it for that purpose." Restatement (Second) of Torts sec. 552 comment a (1977). Accordingly, liability has been limited to cases where (1) the defendant has knowledge of the specific injured party's reliance; or (2) the plaintiff is a member of a group that the defendant seeks to influence; or (3) the defendant has special reason to know that some member of a limited group will rely on the information.[12] *See J. Louis Crum Corp. v. Alfred Lindgren, Inc., supra* at 551.

Here, then, plaintiffs may have a cause of action for negligent misrepresentation only if defendants negligently made false statements as to the fitness of Kemper Arena either directly to the plaintiffs or others (presumably the city), knowing that these plaintiffs would rely on the statements, or intending to influence these plaintiffs' decision to lease the arena, or knowing that plaintiffs were within a limited group which would rely on the information. In other words, statements negligently made to the city that the structure was fit merely to assure the city that the work was complete would not be sufficient. The only statements which would suffice would be those made *expressly for the purpose* of influencing plaintiffs or to assist the city in influencing a finite group, including the plaintiffs, which defendants had special reason to know would rely on the information.

We have some difficulty conceiving of a likely circumstance in which such an intentional representation may have been made here, but it is possible that the city may have received specific assurances of quality from defendants for the known purpose of attracting lessees, assurances on which plaintiffs relied in deciding to lease the

---

12. As to this last category, the court in *Anderson v. Boone County Abstract Co.,* 418 S.W.2d 123, 129–30 (Mo.1967), stated that "assuming without deciding that a cause of action for negligent misrepresentation may be maintained by third parties who act in reliance thereon," according to Professor Prosser the line as to which third parties may sue "definitely has been drawn at cases where the plaintiff is unidentified and the defendant has no special reason to expect that he may act in reliance."

arena.[13] Plaintiffs' petition does not specifically allege that misrepresentations were made for this hypothetical purpose of attracting lessees. Nevertheless, considering allegations in earlier counts as to plaintiffs' leasehold interest as well as allegations in Count V that relying on the misrepresentations, they obtained the rights to use the arena, and in light of our obligation to construe the petition liberally and favorably to plaintiffs, we rule that plaintiffs must be given the opportunity to present what evidence they can that negligent misrepresentations were made for such a known business purpose. We so hold.

### Conclusion

For the foregoing reasons, we hold that plaintiffs' appeal from the trial court's dismissal of Counts I–V was timely; that plaintiffs' Counts I and II state a cause of action against all non-city defendants for negligent interference with a tenant's right to use and enjoy a leasehold within the limitations of the *Begley* exception to the non-liability after acceptance rule; that Count III for products liability was properly dismissed as to all non-city defendants with the exceptions of Kansas City Structural Steel Co. and Bethlehem Steel Corp; that Count IV for implied warranty was properly dismissed as to all non-city defendants owing to lack of privity; and that Count V, liberally construed, does state a cause of action for negligent misrepresentation within the narrow limitations of Restatement (Second) of Torts sec. 552 (1977). Accordingly, we remand this case to the trial court for further proceedings consistent with this opinion.

All concur.

13. Absent plaintiffs' alleged status as a leaseholder, they would not be members of a "limited group" and hence, a negligent misrepresentation cause of action would not exist here. Their status as members of a group consisting of "the general public and other users of Kemper Arena" would not be sufficient, and would impose liability contrary to the express purpose

of sec. 552, at least in the absence of a "public duty", as covered in sec. 552(3). Defendants' fears of liability to a mass public and business community merely because they participated in the construction of the arena and somehow impliedly represented its fitness are unfounded. Such plaintiffs are clearly beyond the line drawn in footnote twelve.