Roger K. CUNDIFF and Rosa
M. Cundiff, Plaintiffs–
Appellants,

v.

Jeffrey S. UMFLEET and Angela
Umfleet, Defendants–
Respondents.

No. 22878.

Missouri Court of Appeals,
Southern District,
Division One.

June 28, 2000.

Jason Glennon Crowell, Oliver, Oliver &
Waltz, P.C., Cape Girardeau, for appel-
lants.

James R. Robison, Robison & Robison,
Sikeston, for respondents.

JOHN E. PARRISH, Judge.

Roger K. Cundiff and Rosa M. Cundiff
(plaintiffs) appeal a judgment for Jeffrey
S. Umfleet and Angela Umfleet (defen-
dants) in plaintiffs' action for negligent
misrepresentation. Judgment was entered
in accordance with a jury verdict for de-
fendants. This court affirms.

Plaintiffs purchased a parcel of Scott
County real estate from defendants. The
real estate included a residence with a
basement. Plaintiffs purchased the prop-
erty July 31, 1996. They did some work
on the property and moved in the middle

of August. The next spring, following heavy rains in "[p]robably late March, beginning of April," water leaked into the basement. Plaintiffs obtained an estimate of the cost to waterproof the basement. They were told it would cost a little over $7,000 to totally waterproof the basement. Plaintiffs had some of the work done. Mr. Cundiff explained that he had a portion of the work done, enough to stop the leaking for the present time. He told the jury he had as much of the work done as he could afford.

Plaintiffs contended defendants falsely represented that there had been no evidence of, or problems with, water leakage or excessive moisture in the basement. They sought damages for negligent misrepresentation.

Plaintiffs based their action on a printed document signed by defendants. The document was admitted in evidence. It is entitled "Seller's Disclosure Statement for Residential Property Addendum to Listing Agreement No. _____." It includes a question that inquires, "Basement/Crawl Space: Has there been evidence of/or problems with water leakage/excessive moisture?" The question is followed by a place for those signing the document to check "yes" or "no." "No" was checked. The space for answering the question was followed by the sentence, "If yes, please explain the frequency and extent of the problem and repairs if any." A printed line was provided for any necessary response.

Plaintiffs' and defendants' real estate sales contract included the provision:

**CONTRACT TO BE CONTINGENT UPON THIRD PARTY INSPECTION:** The parties hereto agree performance under the terms of this contract shall be expressly contingent on an inspection by a third party or parties on Buyer's behalf. Within *21* days after the final acceptance of the sales contract, Buyer, at Buyer's option and expense, has the right to obtain written inspection reports from reputable third party or parties as to structural defects, environ-

mental hazards, plumbing, heating, air conditioning and sewage systems, swimming pool, all mechanical equipment and appliances, and *electrical,* after which time this right shall be waived. Should the result of such inspections not be acceptable to Buyer, Buyer shall have five (5) days in which to furnish Seller a copy of the inspection report or reports and to notify Seller or Listing Agent, in writing, of nonacceptability. Seller shall have five (5) days from receipt of the report and notification in which to agree to correct or repair the unacceptable items prior to closing or to enter into an agreement in writing with Buyer as to a monetary adjustment in lieu of correction of such items. Buyer shall have three (3) days in which to accept Seller's proposal for repairs and correction of the items; and if Buyer shall fail to do so, this contract shall become null and void and the earnest money deposit, less any expenses incurred by or on behalf of Buyer, shall be refunded to Buyer.

Plaintiffs had the property inspected after which, by writing dated July 25, 1996, they notified the realtor who was handling the sale of the property:

During the inspection of 118 E. Clarman, these were noted by the prospective buyers:

- a carpet stain to the left of the laundry door
- a damaged back storm door
- a damaged back door to the garage which apparently had been kicked in since the door facing was also affected
- 3 of the interior doors were damaged and need replacing
- loose railing on the upper level
- a section of the front steps had been siliconed and needs to be removed, scraped, and replaced with mortar
- the front sidewalk has dropped down from the house about 3 inches and needs to be jack-hammered out and replaced

- the driveway needs to be jack-hammered out and slanted away from the house
- one storm window is missing, one storm window is cracked, and one screen is missing

The buyers are willing to accept these and repair these items at their own expense. However, they are concerned by the siding as it appears to be rotten. The replacement cost according to Gregg Construction is approximately $2500 and due to the low appraisal of the house (only $500 more than the purchase price), they are asking sellers to pay for this.

The parties thereafter entered into an agreement dated July 30, 1996, that stated:

At time of closing, sellers agree to give buyers $1,000. for repairs. Roger and Rosa Cundiff agree to close July 31, 1996 according to contract.

It was signed by plaintiffs and defendants.

The real estate sale closed July 31, 1996. Plaintiffs were allowed the $1,000 credit for repairs to which the parties had agreed.

Mr. Cundiff was asked what he remembered about the condition of the basement when he saw it before plaintiffs bought the property. He said it was in good condition, "excellent—I mean, there wasn't any problems. There was a stain on the carpeting but they had—they had a rug down on that and they left the rug to cover that up so I didn't really think anything about that." Mr. Cundiff said the basement was finished; that it had sheetrock, carpeting and a dropped ceiling.

The trial judge instructed the jury:

Instruction No. *9*

Your verdict must be for the defendants if you believe:

First, plaintiffs purchased the real estate described in the evidence pursuant to a written sales agreement, and

Second, the agreement provided that the sale was contingent upon the right of the plaintiffs to obtain an inspection of the property by a third party, and

Third, if the results of that inspection were not acceptable to the plaintiffs they had the right to notify the defendants of the nonacceptability, and

Fourth, the defendants had the right to correct or repair the unacceptable items, or to enter into an agreement for a monetary adjustment in lieu of the correction of such items, and

Fifth, the plaintiffs entered into an agreement with the defendants for a reduction of the purchase price in lieu of the correction or repair of the items which were unacceptable to the plaintiffs, and

Sixth, the reduction in the purchase price was received by the plaintiffs.

Plaintiffs' only point on appeal is directed to Instruction No. 9. It asserts the trial court erred in submitting Instruction No. 9 "in that said instruction fails to follow substantive law; is solely argumentative; is not readily understandable; the evidence adduced at trial clearly showed that the reduction in purchase price entered into between the parties never contemplated compensating the plaintiffs for basement leakage and resulting water damage and gave the jury a roving commission to find in favor of defendants."

Defendants argue that regardless of whether there was instructional error, plaintiffs did not make a submissible case of negligent misrepresentation; that, therefore, the judgment should be affirmed. This court agrees.

 Mindful of the procedural directive in *Grippe v. Momtazee*, 696 S.W.2d 797, 799 (Mo. banc 1985), this court assumes, *arguendo*, that the instruction about which plaintiffs complain was erroneous. The remaining question is whether the giving of the instruction merits reversal or remand for new trial. *Id.* If plaintiffs did not make a submissible case, since they

were not precluded from presenting additional evidence, the giving of the instruction does not merit reversal or remand for new trial. *See Hurlock v. Park Lane Medical Center, Inc.*, 709 S.W.2d 872, 876 (Mo.App.1985).

To make a submissible case, plaintiffs were required to provide evidence (1) that defendants supplied information because of their pecuniary interest in the property they sold to plaintiffs; (2) that because of a failure by defendants to exercise reasonable care or competence, the information was false; (3) that the information was intentionally provided by defendants for guidance of plaintiffs in the transaction whereby plaintiffs bought the property in question from defendants; and (4) that in relying on the information, plaintiffs suffered a pecuniary loss. *See Chubb Group of Ins. Companies v. C.F. Murphy & Assoc., Inc.*, 656 S.W.2d 766, 783–84 (Mo.App. 1983). *See also Colgan v. Washington Realty Co.*, 879 S.W.2d 686, 689 (Mo.App. 1994). A submissible case requires proof of all elements of the cause of action. *Id.*

The alleged false statement was paragraph 2 of the sellers' disclosure statement in which defendants answered "no" to the question, "Has there been evidence of/or problems with water leakage/excessive moisture?" Mr. Cundiff was asked the following questions and gave the following answers:

Q. [by plaintiffs' attorney] ... I'm asking you if when—what you're talking about as the basis for your claim that they lied to you is the statement in the disclosure statement.

A. Yes, that they said the basement didn't leak.

Q. Okay. What—what they actually said was—they put a checkmark in the no block for Item No. 2; didn't they?

A. Yes.

Q. Okay. Would you look at Item No. 2 and just read that to the jury?

A. "Basement crawl space"—let me correct. "Basement/crawl space: Has

there been evidence of/or problems with water leakage/or excessive moisture?" "No" has been marked.

Q. Now, that's—that's the basis that you're asking this jury to find that these young folks lied; isn't it?

A. Yes.

Mr. Cundiff was asked about his testimony concerning a spot on the basement carpet. He stated what he had referred to was a bleached spot on the carpet; that defendants told them about it. He was asked, "You're not—you're not—you didn't mean to suggest to this jury that you were misled in any way about the fact that there was a bleach spot on the carpet?" Mr. Cundiff answered, "No, sir."

■ This court finds no evidence that supports plaintiffs' claim that the information defendants provided with respect to the condition of the basement was false. The evidence did not reveal that defendants had knowledge of a water or leakage problem in the basement. The only evidence of the condition of the house and basement during the time defendants owned the property and had knowledge about its condition was the testimony of Mr. Umfleet, Cheryl Huffman, Mary Hart and Shawn Spies. None of those witnesses provided evidence of any water problem or leakage in the basement or knowledge by defendants that such a problem existed.

Defendants purchased the house they later sold to plaintiffs in 1992. They moved into the house either the last week of November or the first week of December 1992. After they moved into the house and completed the finished area of the basement, defendants used it as a family room. Mrs. Umfleet used the finished area of the basement to provide childcare for other families. Mr. Umfleet testified that there was nothing to cause him to believe there was dampness in the basement; that he never observed a musty smell or mildew or any other sign of dampness in the basement. He testified the

furniture that was in the basement revealed no sign of being in contact with water.

Mr. Umfleet was asked about the condition of the basement when he bought the house he later sold to plaintiffs. At the time he bought the house the basement was "totally unfinished." He explained, "Walls were concrete, the floor was concrete, the ceilings was just open floor joists." An area had been partitioned as a utility room. It included a sump pump. No other part of the basement had been partitioned.

Mr. Umfleet made substantial changes to the basement. He testified:

Q. [by plaintiffs' attorney] Okay. And would you—would you tell us what changes you made to the basement of the house?

A. We finished a family room and also a playroom for the kids and then a utility room that was unfinished.

Q. Okay. Approximately in terms of percentage how much of the basement was included in the family room?

A. Probably two—thirds.

Q. Okay. Now, what improvements did you make to the basement?

A. Well, we—we studded the walls up with wood studs, the outside walls and the interior walls; hung drywall; textured the drywall; put in a drop ceiling; and then had carpet laid.

Q. Okay. Now—

A. And interior doors.

Q. Now, did you do all of that work yourself?

A. I did everything but lay the carpet.

* * *

Q. In the family room what type of carpeting arrangement did you have?

A. We had a very expensive carpet with a very expensive pad, a thick pad and tacked down on the edges.

Q. Now, Jeff, would you have put that kind of carpeting in a place that you thought was going to get wet?

A. Absolutely not.

Two realtors, the realtor through whom Mr. Umfleet purchased the property and four years later listed the property for sale, and the realtor who sold the property for defendants (who was also Mrs. Cundiff's aunt) testified. Cheryl Huffman was the realtor who sold the property to Mr. Umfleet and listed the property for sale when he sold it. Mary Hart was the realtor who handled the sale to defendants.

Ms. Huffman inspected the property at the time Mr. Umfleet bought it in 1992. She examined the basement. The basement was completely unfinished at that time. She observed no indication of water damage or leakage. She was in the basement again when she listed the property for sale in 1996. The basement was finished and used as a family room. It was furnished. Ms. Huffman saw no evidence or indication of water problems in the basement at that time.

Ms. Hart learned of the availability of the property through multilist. She showed it to plaintiffs. She took plaintiffs to the property four or five times before the sale closed. She was in the house, including the basement, on those occasions. She saw no indication that the basement leaked.

A friend of defendants, Shawn Spies, testified that he helped defendants move into the house. He had an opportunity to look over the basement and the inside of the house closely on that occasion. He saw no indication that the basement had a water problem. At that time the basement was unfinished.

Mr. Spies was at the house frequently during the time defendants lived there from late 1992 until the summer of 1996. He said he was there once or twice a week during that time. After the basement was finished for use as a family room, he would spend most of his time there. He was

never aware of the presence of water or any indication of water leakage in the basement. The times he visited included occasions when it was raining. He testified the basement was always dry.

The only witness plaintiffs presented that provided any evidence about the condition of the basement before they bought the property was Mary Jackson, a neighbor. She had lived next door to plaintiffs' property since before their residence was built. She had been in the house before defendants bought it. She said she saw water in the basement two times. One of the occasions was when the house was owned by a Mrs. Woolwen. Ms. Jackson estimated that this was in "the '80's, early 80's probably." She saw workmen going into the house to repair the basement during the time Mrs. Woolwen owned the property. Ms. Jackson said she had been in the basement one other time after Mrs. Woolwen sold the property and saw water in the basement. She had not been in the house since defendants owned the property.

■ Plaintiffs provided no evidence that the part of the disclosure statement defendants signed concerning the basement was false. They therefore failed to provide evidence "that because of a failure by defendant[s] to exercise reasonable care or competence, the information was false," one of the elements for which evidence was required to make a submissible case. *Chubb Group of Ins. Companies,* 656 S.W.2d at 783.

No submissible case was made. Plaintiffs' claim of error does not merit reversal or remand for a new trial in that it had no effect on the evidence plaintiffs presented or attempted to present. *Hurlock,* 709 S.W.2d at 876. The judgment for defendants should be affirmed.

Although it does not affect the disposition of this case, the record on appeal reveals a further matter that warrants comment. The trial record in this case was made by a magnetic tape recording

device. The transcript was transcribed by the State Courts Administrator's office. It includes extraneous matters, viz., the reading of the jury instructions. Rule 81.12 denotes what is to be included in a record on appeal. Rule 81.12(a) explains, "In order to reduce expense and expedite the preparation of the record on appeal, it is divided into two components, i.e. the 'legal file' and the 'transcript.' " Rule 81.12(a) specifies that the legal file is to "contain clearly reproduced exact copies of the pleadings and other portions of the trial record *previously reduced to written form.*" (Emphasis added.) It states, "The transcript shall contain the portions of the proceedings and evidence *not previously reduced to written form.*" (Emphasis added.)

In this case the part of the transcript that included the reading of jury instructions covers only some five pages. In more complex cases jury instructions can be lengthy. Their inclusion thwarts the purpose of a two component record on appeal. It prolongs transcript preparation time and results in an excessive charge for the transcript. The transcribing service of the Office of State Courts Administrator should assure that its personnel who prepare transcripts know what is required to be included in the transcripts and what should not be included in them.

Judgment affirmed.

CROW, P.J., and SHRUM, J., concur.